## UNITED STATES v. KENNEY..

### (Circuit Court, D. Delaware. July 22, 1898.)

1. VIOLATIONS OF NATIONAL BANK LAWS—INTENT TO DEFRAUD.

An intent to injure or defraud a national bank within the meaning of section 5209 of the Revised Statutes of the United States does not necessarily involve malice or ill-will toward the bank. The law presumes that every sane person, who has attained the age of discretion, contemplates and intends the necessary or natural consequences of his own acts; and it is sufficient that the unlawful intent is such as, if carried into execution, will necessarily or naturally injure or defraud the bank.

2. SAME.

The indictment having charged that the defendant, with intent to injure and defraud a national bank, wilfully, unlawfully and fraudulently aided and abetted its paying teller to misapply its moneys, in violation of section 5209, by means of divers checks drawn by the defendant on the bank when he had no funds or insufficient funds on deposit to meet them, the defendant cannot be convicted unless he had a wrongful or illegal intent to injure or defraud the bank in drawing the checks or some one or more of them. Whether or not he had that intent is to be determined by the facts and circumstances and the surroundings at the time he drew the checks. If at that time he knew or had good reason to believe that they or any of them were to be fraudulently paid by the teller out of the funds of the bank, and not out of any funds to which the defendant could legitimately resort, he had the guilty intent; and although it may have been the intention of the defendant at the time he drew such checks finally to recompense or remedy the injury resulting from his act to the bank, such an intent to correct the wrong would not absolve him from guilt. Nor would the fact, if fact it be, that he hoped through successful operations in stocks or other property, or otherwise, to be placed in a position to restore to the bank moneys wilfully misapplied through his wrongful act be any answer to the charge of criminality. No man is permitted to aid or abet the wilful misapplication of the funds of a national bank because he hopes in the future to repair his wrong.

3. SAME—OVERDRAFTS—CONCEALMENT FROM BANK OFFICERS—COLLUSION WITH TELLER.

If there was a fraudulent scheme, understanding or agreement between the defendant and the paying teller that checks drawn by the defendant on the bank in favor of a firm of stock brokers, for the benefit and advantage of the defendant, were to be paid by the teller out of the funds of the bank when the defendant had no funds or only insufficient funds to his credit or was overdrawn in his account, and that such checks were not to be charged in the defendant's account, but were to be fraudulently concealed from the proper bank officials, until the defendant should make deposits sufficient to meet them, the defendant had a guilty intent to injure or defraud the bank. For such scheme, understanding or agreement, if carried out, involved a fraudulent and wilful misapplication of

90 F.—17

the moneys of the bank to the amount of such checks, and wrongfully and unlawfully deprived the bank of the use and control of such moneys until deposits subsequently made by the defendant covered the shortage thus created.

4. SAME.

A man may overdraw his account in a bank and be innocent of any evil or unlawful purpose. A bank may desire to accommodate temporarily a depositor; and, if a depositor knowingly makes an overdraft, his relations with the bank or its officials may be of such a character as to prevent the taint of criminality from attaching to the transaction. But no man who is without a balance to his credit, or who has only an insufficient balance, has a right to draw checks for considerable amounts without the knowledge or consent of the proper officials, and with a fraudulent intent that the moneys of the bank in which he has no funds or not sufficient funds to his credit, shall be applied to the payment of those checks.

5. SAME—PROOFS OF FRAUD.

Fraud, being essentially a matter of motive or intention, is often deducible only from a great variety of circumstances, no one of which is absolutely decisive; but which in combination with each other may become persuasive as to the true nature and character of the transactions in controversy, and in cases in which the existence of fraud is in issue evidence of other acts and doings of the defendant of a kindred character are admissible in order to illustrate or establish the intent or motive in doing the particular act or acts directly in question.

6. CRIMINAL LAW—WEIGHT AND EFFECT OF EVIDENCE.

The verdict of the jury should not be controlled by contradictions on minor points, provided the evidence, taken as a whole, after making all due allowance for any such contradictions, leads to a fixed conclusion of the guilt of the defendant. Criminal cases involving much testimony and many facts should not be decided upon the probability or improbability of any one point singled out of the evidence; but a proper decision requires due consideration to be given to all the evidence, direct and circumstantial, in the case.

7. SAME—TESTIMONY OF DEFENDANT—WEIGHT AND CREDIBILITY.

The deep personal interest which a defendant in a criminal case has in its result should be considered by the jury in weighing his evidence, and in determining how far, if at all, it is worthy of credit. In considering the credibility of or weight which should be given to the testimony of the defendant in this case, the jury should regard, among other things, the inherent probability or improbability of his statements, his intelligence or want of intelligence, his opportunities for knowledge of business methods, and to what extent, if any, he has been corroborated by other evidence in the case.

8. SAME—PRESUMPTION OF INNOCENCE.

The presumption of innocence is evidence in favor of the defendant in a criminal case and stands as his sufficient protection unless it has been overcome and removed by the evidence in the case, taken as a whole, proving his guilt beyond a reasonable doubt.

9. SAME—DEFENDANT'S REPUTATION FOR HONESTY AND INTEGRITY.

While the circumstances in one case may be such as to require a verdict of guilty, notwithstanding an established reputation for honesty and integrity on the part of the defendant, in another case they may be such that an established reputation for honesty and integrity on the part of the defendant would create a reasonable doubt as to his guilt and require an acquittal, although aside from such reputation the evidence in the case would be convincing and justify a verdict of guilty.

10. SAME—DELIBERATIONS OF JURY.

If a large majority of the jurors differ in their conclusions with the minority, it is proper for those composing such minority, in view of the fact of such difference, to review the grounds of their own conclusions in order that, if possible, unanimity may be reached in accordance with

the principles of law laid down by the court. But no juror should acquiesce against his individual judgment in the conclusions reached by other jurors, whether constituting a majority or a minority of the jury; as the verdict must represent the real opinion and judgment of each member of the jury.

(Syllabus by the Court.)

This was an indictment against Richard R. Kenney for violating the national banking laws.

Lewis C. Vandegriff, U. S. Atty.

George Gray and Levi C. Bird, for defendant.

BRADFORD, District Judge (charging jury). The indictment, as it now stands, charges the defendant, Richard R. Kenney, with violating section 5209 of the Revised Statutes of the United States. That section is as follows:

"Sec. 5209. Every president, director, cashier, teller, clerk, or agent of any association, who embezzles, abstracts, or willfully misapplies any of the moneys, funds, or credits of the association; or who, without authority from the directors, issues or puts in circulation any of the notes of the association; or who, without such authority, issues or puts forth any certificate of deposit, draws any order or bill of exchange, makes any acceptance, assigns any note, bond, draft, bill of exchange, mortgage, judgment, or decree; or who makes any false entry in any book, report, or statement of the association, with intent, in either case, to injure or defraud the association or any other company, body politic or corporate, or any individual person, or to deceive any officer of the association, or any agent appointed to examine the affairs of any such association; and every person who with like intent aids or abets any officer, clerk, or agent in any violation of this section, shall be deemed guilty of a misdemeanor," &c.

The words "any association," as used in section 5209 above quoted, relate to any national banking association organized under the laws of the United States. The First National Bank of Dover, in this District, is admitted to be, and to have been at the time of the alleged commission by the defendant of the offenses specified in the indictment, such an association. The indictment against the defendant as returned by the grand jury originally contained twenty-five counts, numbered serially. A number of the counts have been either disposed of on demurrer or abandoned by the District Attorney, and are not for your consideration. The counts remaining for your consideration are counts numbered ten, eleven, twelve, thirteen, seventeen, and eighteen. You will bear in mind the numbers of the counts just mentioned which are for your consideration in order to avoid confusing any of them with other counts originally contained in the indictment. I repeat, to aid your recollection, and prevent any misunderstanding on your part, that the counts which remain open for your consideration are counts numbered ten, eleven, twelve, thirteen, seventeen and eighteen. These counts are before you in connection with the evidence applicable to them, and embrace all the issues which are for your determination. The counts numbered ten, eleven, twelve and thirteen, charge in substance that the defendant did, with intent to injure and defraud The First National Bank of Dover, wilfully, unlawfully and fraudulently aid and abet William N. Boggs, who was the teller, wilfully, unlawfully and fraudulently to misapply the mon-

eys of that bank for the use, benefit and advantage of the said William N. Boggs, he, William N. Boggs, having the intent through such misapplication to injure and defraud the bank. The remaining counts, namely, counts numbered seventeen and eighteen, charge in substance that the defendant did, with intent to injure and defraud The First National Bank of Dover, wilfully, unlawfully and fraudulently aid and abet William N. Boggs, who was the teller, wilfully, unlawfully and fraudulently to misapply the moneys of that bank for the use, benefit and advantage of the defendant, he, William N. Boggs, having the intent through such misapplication to injure and defraud the bank. In order to warrant a conviction of the defendant under all or any of the counts numbered ten, eleven, twelve and thirteen, all of the essential ingredients of the offense as charged therein, must have been established to your satisfaction beyond a reasonable doubt. Under these counts it is necessary, in order to find a verdict of guilty, that you shall be satisfied that William N. Boggs, who was teller, wilfully, unlawfully and fraudulently misapplied, as therein charged, moneys of The First National Bank of Dover, for the use, benefit and advantage of the said William N. Boggs, and with intent on the part of William N. Boggs to injure or defraud the bank; and further, that the defendant, with like intent to injure or defraud the bank, wilfully, unlawfully and fraudulently aided or abetted William N. Boggs, as such teller, in effecting such wilful misapplication. In order to warrant a conviction of the defendant under either count numbered seventeen or count numbered eighteen, all of the essential ingredients of the offense as charged therein must have been established to your satisfaction. Under these counts it is necessary, in order to find a verdict of guilty, that you shall be satisfied that William N. Boggs, who was teller, wilfully, unlawfully and fraudulently misapplied as therein charged, moneys of The First National Bank of Dover, for the use, benefit and advantage of the defendant, with intent on the part of William N. Boggs to injure or defraud the bank; and further, that the defendant with like intent to injure or defraud the bank, wilfully, unlawfully and fraudulently aided or abetted William N. Boggs in effecting such wilful misapplication. There is uncontradicted evidence, and it is admitted by the counsel for the defendant, that William N. Boggs, at the time of his flight from Dover on May 29, 1897, was a defaulter to the amount of $107,000, and that that sum represented moneys of The First National Bank of Dover which he had as receiving and paying teller of that bank unlawfully embezzled, abstracted and misapplied, in violation of section 5209 of the Revised Statutes of the United States. It also appears from uncontradicted testimony in the case that within a few days after the flight of William N. Boggs, his defalcation was discovered by the officers of the bank, and upon subsequent investigation ascertained to amount to the above mentioned sum. Irving D. Boggs, who was bookkeeper of the bank, testified to the effect that its individual ledger contained entries showing balances due from time to time to the defendant as one of its depositors, and also overdrafts by the defendant from time to time as a depositor; and further that he, Irving D. Boggs, had no knowledge of the alleged fraudulent checks drawn by the defendant upon

the bank, until after the flight of William N. Boggs. Irving D. Boggs further testified that whenever he received a deposit from any depositor of the bank he did contemporaneously and truly enter in his own handwriting the amount thereof in the individual ledger to the credit of the depositor; and further that when William N. Boggs, as teller, reported to him, Irving D. Boggs, the amount of any deposit which he, William N. Boggs, had received, he, Irving D. Boggs, would in like manner enter the amount thereof in the individual ledger to the credit of the person so reported by William N. Boggs to have made such deposit; and further that the usual though not invariable course was for him, Irving D. Boggs, to correctly make entries in the individual ledger directly from an inspection by him of the deposit slips. William N. Boggs testified to the effect that whenever any deposit was made by or on account of the defendant, he either correctly reported that amount to Irving D. Boggs, the bookkeeper, for entry in the individual ledger to the credit of the defendant, or in case of the absence of Irving D. Boggs, truly and accurately made such entry in the individual ledger himself; and further, that with the exception of four deposits specified by him, such entries were made in the individual ledger contemporaneously with the deposits. The four deposits which were not entered in the individual ledger contemporaneously with their receipt, were as follows, as testified to by William N. Boggs. On June 20, 1896, there was a deposit of $100, which was not credited to the defendant in his account in the individual ledger until three days thereafter. On July 23, 1896, there was a deposit of $1386.50, which was not credited to the defendant in his account in the individual ledger until two days thereafter. On December 7, 1896, there was a deposit of $188.85, which was not credited to the defendant in his account in the individual ledger until four days thereafter. And on February 2, 1897, there was a deposit of $725, which was not credited to the defendant in his account in the individual ledger until three days thereafter. T. Edward Ross, the expert accountant, testified to the effect that the balances as shown in the deposit book of the defendant whenever the deposit book was settled agreed with the balances as shown in the individual ledger, and that the deposits agreed except in four instances; which correspond exactly with the four deposits withheld as testified to by William N. Boggs. It appears from the testimony of William N. Boggs and Irving D. Boggs that not taking into consideration checks alleged to have been fraudulently drawn by the defendant upon the bank, the entries in the individual ledger relating to the defendant's account were so carried on as to accurately show, with the exception of the four deposits just mentioned, the true condition of his account as a depositor at all times within the period above mentioned. These entries are before you, not as independent evidence of themselves, but as proper for your consideration in connection with the testimony of William N. Boggs and Irving D. Boggs, as tending, in connection with that testimony, to show the amounts of the balances whether due from the defendant to the bank or from the bank to the defendant, aside from the alleged fraudulent check transactions of the defendant.

Before adverting to the evidence in the case I shall now bring to

your attention some elementary principles of law necessary for your guidance in determining upon your verdict. The law presumes persons charged with crime are innocent until they are proved by competent evidence to be guilty. This presumption is evidence in favor of the defendant and stands as his sufficient protection unless it has been overcome and removed by the evidence in the case taken as a whole, proving his guilt beyond a reasonable doubt. To justify a verdict of guilty the evidence adduced in the case as a whole must be such as to exclude every reasonable hypothesis but that of the guilt of the defendant as charged in one or more of the counts in the indictment remaining open for your consideration; and from this it, of course, follows, that if the jury find that all the evidence in the case, when taken together, is as compatible with the theory of innocence as with the theory of guilt, there should be an acquittal. The commission of a criminal offense can be proved by circumstantial evidence as well as by direct evidence, provided the circumstances proved, together with all reasonable inferences drawn from them, are such as to leave no reasonable doubt in the minds of the jury that the defendant is guilty. You are to take into consideration all the evidence in this case, both direct and circumstantial, together with all reasonable inferences to be drawn from that evidence, in arriving at a conclusion. A reasonable doubt is a doubt based on reason, and which is reasonable in view of all the evidence. It is not a whimsical, arbitrary or purely speculative doubt; nor a mere conjecture or guess. If after an impartial comparison and consideration of all the evidence you can candidly say that you are not satisfied of the defendant's guilt, you have a reasonable doubt; but if, after such impartial comparison and consideration of all the evidence you can truthfully say that you have a fixed conviction of the defendant's guilt, such as you would be willing to act upon in the more weighty and important matters relating to your own affairs; you have no reasonable doubt, and in that case should find a verdict of guilty. Absolute certainty is not required for such a verdict. Proof beyond a reasonable doubt as above defined is sufficient. A number of reputable witnesses have testified that for many years last past the reputation of the defendant for honesty and integrity in the community in which he has resided during that period has been good. This testimony is evidence in favor of the defendant and is before you for your consideration in connection with the other evidence in the case. In all cases in which a person accused of a crime, involving dishonesty and want of integrity, is on trial, his good reputation for honesty and integrity or, as it is sometimes called, his good character for honesty and integrity, is properly to be submitted to the jury. The purpose of such testimony is to enable the jury to determine the degree of improbability that the person on trial, who possesses such a reputation, should have committed such a crime. What weight is to be given to the good reputation of the defendant rests solely with the jury. The circumstances in one case may be such that an established reputation for honesty and integrity on the part of the defendant would create a reasonable doubt as to his guilt, although

without such reputation the evidence in the case would be convincing and justify a verdict of guilty. In another case the circumstances may be such as would require a verdict of guilty notwithstanding an established reputation for honesty and integrity on the part of the defendant. It does not necessarily follow from the fact that a man has a good reputation for honesty and integrity that he actually possesses those traits of character. The mere possession of such a reputation does not render the person possessing it incapable of committing a crime involving dishonesty and a want of integrity. It is within the common knowledge of mankind that many persons bearing a good reputation have nevertheless been guilty of crime. While the reputation of the defendant for honesty and integrity is for your consideration as part of the evidence in the case, it is entitled to just the weight,—no less and no more, —which you, upon a review of all the evidence in the case and in the exercise of a sound judgment shall attach to it. While the court brings to your attention some of the evidence on both sides, you are instructed that you are not in the least to be controlled by anything which has been or shall be stated by the court in relation to the evidence in this case, and are to exercise your own independent judgment in relation to the same. While it is my duty to call your attention to such portions of the evidence as in the judgment of the court may aid you in arriving at a just verdict, you are to give to the testimony only such weight and effect as you consider it entitled to. The alleged fraudulent checks set forth in the indictment as it now stands it is admitted were all drawn by the defendant on The First National Bank of Dover, and are as follows: A check drawn September 21, 1896, for $300, in favor of William Anderson; a check drawn September 30, 1896, for $250, in favor of William Anderson; a check drawn October 16, 1896, for $275, in favor of William Anderson; a check drawn October 22, 1896, for $230, in favor of William Anderson; a check drawn November 27, 1896, for $200, in favor of William Anderson; a check drawn May 6, 1896, for $1650, in favor of Samuel L. Shaw, Sheriff; a check drawn September 23, 1896, for $900, in favor of E. B. Cuthbert & Co.; a check drawn May 8, 1896, for $250, in favor of E. B. Cuthbert & Co.; a check drawn May 12, 1896, for $250, in favor of E. B. Cuthbert & Co.; a check drawn June 2, 1896, for $300, in favor of E. B. Cuthbert & Co.; another check drawn June 2, 1896, for $200, in favor of E. B. Cuthbert & Co.; a check drawn June 4, 1896, for $500, in favor of E. B. Cuthbert & Co.; a check drawn June 13, 1896, for $500, in favor of E. B. Cuthbert & Co.; a check drawn June 29, 1896, for $500, in favor of E. B. Cuthbert & Co.; and a check drawn July 2, 1896, for $1000, in favor of E. B. Cuthbert & Co. There is evidence in the case, oral and documentary, including the testimony of T. Edward Ross, the expert accountant, based upon a comparison of the books of The Farmers' Bank at Dover, and The Union National Bank at Wilmington, with the individual ledger of The First National Bank of Dover, tending to show that, at the times the checks set forth in the indictment as it now stands, respectively were drawn by the defendant and paid out of the funds

of The First National Bank of Dover, the account of the defendant was either overdrawn, and sometimes overdrawn to a large amount, or that the defendant had not sufficient moneys to his credit in his account in that bank to meet these checks. I shall not weary you with a recital of all the details involved in this subject, as the matter has been so recently and fully presented to you in the evidence and in the arguments of counsel. The court has allowed the introduction of evidence respecting a number of checks, other than those set forth in the indictment, alleged to have been drawn by the defendant upon The First National Bank of Dover, for various sums, when the defendant's account was either overdrawn or did not contain sufficient balances in favor of the defendant to pay the checks so drawn, and which checks were paid out of the funds of that bank, not being charged to the defendant at the time of such payment, according to the testimony. The introduction of this evidence was allowed as tending to show the intent or motive of the defendant in drawing and securing the payment out of the funds of The First National Bank of Dover of such checks. The reason for the introduction of the evidence respecting checks not set forth in the indictment is found in the fact that fraud, being essentially a matter of motive or intention, is often deducible only from a great variety of circumstances, no one of which is absolutely decisive; but which in combination with each other may become persuasive as to the true nature and character of the transactions in controversy. And in cases in which the existence of fraud is in issue evidence of other acts and doings of the defendant of a kindred character are admissible in order to illustrate or establish his intent or motive in doing the particular act or acts directly in question. You are, however, instructed that you cannot find a verdict of guilty against this defendant on account of any transaction connected with any check not set forth in the indictment as it now stands. There is evidence, and it has not been controverted, that the five above mentioned checks drawn by the defendant on The First National Bank of Dover, in favor of William Anderson, were for the benefit and advantage of William N. Boggs, and there is further evidence that all of those five checks were paid out of the funds of The First National Bank of Dover, but were never charged to the account of the defendant in the books of that bank, and that the amounts so paid out of the funds of that bank on those checks were wholly lost to the bank. There is evidence, and it has not been controverted, that the above mentioned check for $1650, drawn by the defendant on The First National Bank of Dover, in favor of Samuel L. Shaw, Sheriff, was used in connection with the purchase at sheriff's sale of a certain farm which was bought by or on account of William N. Boggs; and there is evidence that this check for $1650 was paid out of the funds of The First National Bank of Dover, but was never charged to the account of the defendant on the books of that bank, and that the amount so paid out of the funds of that bank on this check was wholly lost to the bank. There is evidence, and it has not been controverted, that the above mentioned check for $900, drawn by the defendant on The First

National Bank of Dover, in favor of E. B. Cuthbert & Co., was used in connection with certain stock speculations carried on either by William N. Boggs or Ezekiel T. Cooper with E. B. Cuthbert & Co. The evidence is conflicting on the point whether this check was intended for the benefit and advantage of William N. Boggs, on the one hand, or of Ezekiel T. Cooper, on the other. The question presented by this conflict of evidence is for your consideration and solution. There is evidence that this check for $900 was paid out of the funds of The First National Bank of Dover, but was never charged to the account of the defendant on the books of that bank, and that the amount so paid out of the funds of that bank on this check was wholly lost to the bank. There is evidence, and it has not been controverted, that the eight above mentioned checks, not including the check of $900 just referred to, drawn by the defendant on The First National Bank of Dover, in favor of E. B. Cuthbert & Co., were for the benefit and advantage of the defendant, and there is further evidence that those eight checks were paid out of the funds of The First National Bank of Dover, but were not charged to the account of the defendant on the books of that bank concurrently with their payment, but, on the contrary, were withheld from the account of the defendant for varying periods of time after they were so paid; those periods ranging from three days to several months. An average of those varying periods testified to amounts to about thirty two days. While the respective amounts of the eight checks last referred to were, at the expiration of those respective periods, paid by the defendant to The First National Bank of Dover, that bank was deprived of the use and control during those respective periods of its funds to the amount of the checks respectively withheld during those periods. This constituted a loss and injury to the bank. Of course, if you should believe from the evidence that the defendant in giving checks mentioned in the indictment as it now stands, at the request and for the use, benefit and advantage of William N. Boggs, honestly believed that William N. Boggs had ample means of his own to pay the same, and that the same were being paid by William N. Boggs out of his own money, and not out of the moneys, funds and credits of The First National Bank of Dover, you could not convict the defendant with respect to those check transactions. The main question in the case is whether or not the defendant, with intent to injure and defraud The First National Bank of Dover, wilfully, unlawfully and fraudulently aided or abetted William N. Boggs, as teller, wilfully and unlawfully to misapply the moneys of that bank for the use, benefit and advantage of the defendant or of William N. Boggs, as respectively charged in the indictment as it now stands; he, William N. Boggs, having in making such misapplication a like intent, and the defendant knowing that William N. Boggs was teller. You must be satisfied, in order to find a verdict of guilty, that the defendant had knowledge of the intention of William N. Boggs so to misapply the moneys of The First National Bank of Dover, and that the defendant did some act or acts for the purpose of aiding or abetting William N. Boggs in making such misapplication. If the

other ingredients of the crime existed, the aiding or abetting could be accomplished through the instrumentality of a check or checks drawn upon The First National Bank of Dover, which either caused or facilitated the prohibited misapplication of its funds. Under the counts of the indictment as it now stands, all of which charge the defendant with aiding or abetting William N. Boggs wilfully, unlawfully and fraudulently to misapply the moneys of The First National Bank of Dover, the drawing of a fraudulent check by the defendant and his procuring it to be paid by William N. Boggs, as teller, out of the funds of the bank in manner as alleged in the indictment, constitutes the act of aiding or abetting within the meaning of the law. Much has been said on the subject of overdrafts, and the circumstances under which they are or are not criminal under section 5209 of the United States Revised Statutes. A man may overdraw his account in a bank and be innocent of any evil or unlawful purpose. Overdrafts are not uncommon in bank transactions. A bank may desire to accommodate temporarily a depositor, and if a depositor knowingly makes an overdraft his relations with the bank or its officials may be of such a character as to prevent the taint of criminality from attaching to the transaction. But no man who is without a balance to his credit in a bank or who has only an insufficient balance, has a right to draw checks for considerable amounts without the knowledge or consent of the proper officials and with a fraudulent intent that the moneys of the bank in which he has no funds or not sufficient funds to his credit shall be applied to the payment of those checks. The defendant cannot be convicted unless he had the wrongful or illegal intent to injure or defraud the bank in drawing the alleged fraudulent checks or some one or more of them set forth in the indictment as it now stands. Whether or not he had that intent is to be determined by the facts and circumstances and the surroundings at the time he drew those checks. If he knew or had good reason to believe when he drew the checks set forth in the indictment as it now stands that they or any of them were to be fraudulently paid by William N. Boggs, the teller, out of the funds of the bank, and not out of any funds to which he, the defendant, could legitimately resort, he had the guilty intent. And although it may have been the intent of the defendant at the time he drew the alleged fraudulent checks to finally recompense or remedy the injury resulting from his act to The First National Bank of Dover, such an intent to correct the wrong does not absolve him from guilt. Nor would the fact, if fact it be, that he hoped through successful operations in stocks or other property, or otherwise, to be placed in a position to restore to the bank moneys wilfully misapplied through his wrongful act be any answer to the charge of criminality. No man is permitted to aid or abet the wilful misapplication of the funds of a national bank because he hopes in the future to repair his wrong.

So if you are satisfied that there was a fraudulent scheme, understanding or agreement between the defendant and William N. Boggs that the eight checks drawn by the defendant on The First

National Bank of Dover, in favor of E. B. Cuthbert & Co. for the benefit and advantage of the defendant, were to be paid by William N. Boggs, as teller, out of the funds of that bank, when he, the defendant, had either no funds or only insufficient funds or was overdrawn in his account and that such checks were not to be charged in the defendant's account, but were to be fraudulently concealed from the proper bank officials until he should make deposits sufficient to meet them, the defendant had a guilty intent to injure or defraud the bank. For such scheme, understanding or agreement, if it existed and was carried out, as testified to, involved a fraudulent and wilful misapplication of the moneys of the bank to the amount of such checks, and wrongfully and unlawfully deprived the bank of the use and control of such moneys until deposits subsequently made by the defendant, as testified to, covered the shortage thus created. An intent to injure or defraud a national bank within the meaning of section 5209 of the United States Revised Statutes does not necessarily involve malice or ill-will toward the bank. There are few, if any, cases in which the funds of a bank are embezzled, abstracted or wilfully misapplied merely for the purpose of injuring the bank. Such funds are embezzled, abstracted or wilfully misapplied for personal gain. But the law presumes that every sane person who has attained the age of discretion contemplates and intends the necessary or natural consequences of his own acts. It is sufficient that the unlawful intent is such that, if carried into execution, it will necessarily or naturally injure or defraud the bank. It is wholly immaterial in this case whether the money alleged to have been taken from the funds of The First National Bank of Dover and applied to the payment of the alleged fraudulent checks, or any of them, set forth in the indictment as it now stands, was so taken for the sole use, benefit and advantage of the defendant or for the use, benefit and advantage of the defendant with others; and it is also wholly immaterial whether the money alleged to have been taken from the funds of that bank and applied to the payment of the alleged fraudulent checks for the use, benefit and advantage of William N. Boggs, was so taken for the sole use, benefit and advantage of William N. Boggs or for the use, benefit and advantage of William N. Boggs with others. It is also wholly immaterial so far as the guilt or innocence of this defendant is concerned, whether the alleged fraudulent checks of the defendant set forth in the indictment as it now stands, were intended for the use, benefit and advantage of himself, on the one hand, or for the use, benefit and advantage of William N. Boggs, on the other, provided, the evidence in the case supports the allegations in the different counts of the indictment as it now stands, or some one or more of them.

William N. Boggs has pleaded guilty to the charge of unlawfully embezzling, abstracting and misapplying the moneys, funds and credits of The First National Bank of Dover, and in this case he has testified in the character of an accomplice. While the testimony of an accomplice should always be received with caution and weighed and scrutinized with great care by the jury, the accomplice

is nevertheless a competent witness, and the degree of credit which should be given to the testimony of an accomplice is a matter exclusively within the province of the jury. While the jury as a matter of law may convict a person accused of a grave crime upon the uncorroborated testimony of an accomplice, it is, however, usual for the court to advise the jury against a conviction unless the testimony of the accomplice has been corroborated by competent evidence in some material part or parts. The corroboration need not extend to all matters testified to by the accomplice, but it being shown that the accomplice has testified truly in some particulars, it may be inferred by the jury that he has in others. In this case you are to determine upon the evidence whether William N. Boggs has or has not been corroborated with respect to material parts of his testimony by the documentary evidence and the testimony of other witnesses; and you are also to determine whether or not William N. Boggs has been successfully contradicted, if at all, with respect to any material portion of his testimony. It is also true, gentlemen, that while the court is careful to remind you that the credit of William N. Boggs is entirely for your consideration, it would be very far from your duty if, disregarding what may seem to you natural and inherently truthful testimony given by him, you should permit yourselves to be carried away by fierce denunciations, by heated language, and by excited and unwarranted epithets applied to him. On the contrary with measured and impartial deliberation, like men who have a large interest at stake, you should carefully, anxiously and judicially scan and weigh the evidence of William N. Boggs. The law permits the defendant, at his own request, to testify in his own behalf. The defendant here has availed himself of this right. His testimony is before you and you must determine how far it is credible. The deep personal interest which he has in the result of this case should be considered by you in weighing his evidence, and in determining how far, or to what extent, if at all, it is worthy of credit. In considering the credibility of or weight which you should give to the testimony of the defendant, you should regard, among other things, the inherent probability or improbability of his statements, his intelligence or want of intelligence, his opportunities for knowledge of business methods, and to what extent, if any, he has been corroborated by other evidence in the case. You should especially look to the interest any witness who has testified before you in this case has in its result. Where a witness has a direct personal interest in the result of a case the temptation is strong to color, pervert or withhold the facts.

William N. Boggs testified, among other things, to the effect that his defalcation at The First National Bank of Dover, first became known to the defendant in the early part of October, 1895; that at that time his defalcation was from $20,000 to $30,000; that he told the defendant, as his counsel, at that time the state of affairs as nearly as he could and the defendant advised him in relation to certain matters connected with them; that he, William N. Boggs, was greatly encouraged by the interview he had with the defendant at that time; that the defendant inquired at that time what

assets he had that could be utilized or what means to resort to for the payment of the defalcation; and that the defendant undertook to collect certain claims that he, William N. Boggs had against Thomas S. Clark. William N. Boggs further testified that from the time of his consultation with the defendant in October, 1895, up to and including 1896, he had many conversations with the defendant in relation to his defalcation; that the defendant knew that his defalcation continued during all that time; that the defendant would ask him how he was getting along; that at the time of his consultation with the defendant in October, 1895, the defendant asked him how he had concealed his defalcation from the examiner and from the officials of the bank; that the special thing that he, William N. Boggs, feared at that time was an examination which he thought was to be made on the following day. and that the defendant said to him, William N. Boggs, "You have concealed it before, I don't see why you cannot do it again," or words to that effect; that he carried the Cuthbert and other checks for the defendant because they were in a hole together; that "Mr. Kenney knew that I was in a hole and I knew Mr. Kenney was in a hole, and he was doing what he could, as I thought, to help me, and I was doing what I could, as I thought, to help him;" that he held out the defendant's checks without the knowledge or consent of the bank or its officers and with the knowledge and consent of the defendant, the defendant knowing at the time that he, William N. Boggs, was in default to the bank; that he, William N. Boggs, when the defendant gave the Shaw check, the Anderson checks and the $900 Cuthbert check, told the defendant that they would not be charged to his account, the defendant knowing at the time that he, William N. Boggs was in default to the bank; that he, William N. Boggs, had an arrangement with the defendant for the payment of the defendant's checks out of the funds of the bank, and that he paid every check of the defendant out of such funds whether the defendant's account was or was not good for it; that the real reason why he, William N. Boggs, went to the defendant and borrowed any of his checks was because, "I was very intimate with him, was as intimate as anyone else, and that he knew as much about my affairs as anyone, and that the favors that I was extending to him I considered equal or greater that the ones that I was asking of him;" that the plan of him, William N. Boggs, in balancing the defendant's deposit book was that it should always be balanced so as to show "as near even as possible on the ledger," thus creating no suspicion, showing either a small balance or a small overdraft, and that in balancing the defendant's book, if at the time he, William N. Boggs was holding out any of the defendant's checks, he would call the defendant's attention to those, so that he could see whether they were being carried on the bank's ledger, and that "what we were carrying on the bank's ledger with the checks that I was holding out did correspond with the balance, if he correctly kept it, of his own account;" and that any checks that were held out at the time of the settlement of the deposit book would not show upon the books of the bank, those checks being the same to

which he, William N. Boggs called the attention of the defendant on several occasions.

The defendant testified, among other things, to the effect that he had known William N. Boggs since about 1881; that William N. Boggs was a very much younger man than the defendant; that the defendant became counsel for William N. Boggs in 1892 or 1893; that up to that time the defendant's relation with William N. Boggs had not been intimate, and that the defendant never had any social intimacy at all with William N. Boggs; that the defendant first learned of the defalcation of William N. Boggs to The First National Bank of Dover in November, 1894, soon after the general election; that at that time William N. Boggs came to the defendant's house at night and told the defendant that he, William N. Boggs, was in trouble with the bank; that the defendant was surprised and horrified to hear it; that William N. Boggs came to the defendant as his counsel for advice as to what he, William N. Boggs, should do; that the defendant told William N. Boggs, "you have friends and relations enough who can fix this matter up before it becomes public;" that William N. Boggs did not inform the defendant of the amount of his defalcation or of the way in which it occurred, nor did the defendant ask him about the amount of the shortage, either then or at any other time; that this interview did not last ten minutes, and William N. Boggs at its conclusion left the defendant's house seeming to be very much relieved; that at no time after this interview did William N. Boggs make any reference to the defalcation to the defendant until about a week before his flight from Dover, which occurred May 29, 1897; that the defendant was positive that the interview occurred in November, 1894; that in the fall of 1895 William N. Boggs spoke to the defendant about his trouble with the directors of the bank because of his playing cards; that William N. Boggs told the defendant that he had satisfied the directors that he would quit playing cards, and that he had seen Mr. Massey in Philadelphia, one of his bondsmen, upon the subject, and Mr. Massey told him, William N. Boggs, that he would forgive him for playing cards and gambling if he were all right in his accounts with the bank; that William N. Boggs told the defendant that he had satisfied Mr. Massey; that the defendant had every reason to believe that William N. Boggs was square with the bank, and that he was apparently in funds during 1895 and 1896; that from the last of 1895 to October, 1896, William N. Boggs had, exclusive of his salary as teller and his notarial fees, cash or other property amounting in the aggregate to $4282.13, and William N. Boggs frequently told the defendant that he, William N. Boggs, was making a large amount of money in speculating and gambling operations; that the defendant had no knowledge whatsoever of the holding out of his checks upon the bank as set forth in the indictment; that he knew at various times during the period covered by the alleged fraudulent checks that he had overdrawn his account in the bank and had been called upon by the officers of the bank to make certain checks good; that he had no idea of the condition of his account as testified to on the part of the government;

that he relied entirely upon the bank to keep his account; or "upon Mr. Boggs rather, who really was the only officer in the bank that I came in contact with in a business way; he always took charge of the matters generally and whenever it was necessary for me to make a deposit or to cover my account he always notified me, and I never failed in my life when notified that I was overdrawn or had a check and my funds were not sufficient to pay it that I did not promptly get the money and make it good. And this condition running over that period of time as shown here by this examination was then and up to the time that they testified on the stand as new to me as to you;" that the defendant had no doubt but that his deposits were just about keeping up with his checks justifying the balances struck every two or three months showing that he either had a small balance or a very insignificant overdraft; and that the defendant when his account became overdrawn was notified to make it good by William N. Boggs or some other officer of the bank. The defendant in his testimony further denies in effect any fraud on his part in connection with any of the checks set forth in the indictment as it now stands. I have thus presented to you what seem to the court to be the more material portions of the defendant's testimony. Is that testimony probable or improbable, when taken by itself, or in connection with the other evidence, oral and documentary, in the case. The defendant has been a member of the bar since October 21, 1881, and has been actively engaged in the practice of his profession. Before the alleged fraudulent checks were given he knew, upon his own showing, that William N. Boggs was teller of The First National Bank of Dover, and that as such teller he had been guilty of a defalcation to that bank. William N. Boggs testified that early in October, 1895, he consulted for the first time the defendant as his counsel with respect to that defalcation. The defendant admits that William N. Boggs consulted him with respect to the defalcation, but states positively that the consultation occurred in November, 1894, after the general election. The discrepancy as to the date between William N. Boggs and the defendant may not be material, but it may be observed in passing that the defendant, in his interview with Thomas J. Ewell, reporter for the Baltimore Sun, stated that the consultation occurred "in November, 1893 or 1894, I am uncertain as to the date." The defendant testified to the effect that at this consultation he was surprised and horrified at the announcement by William N. Boggs of his defalcation, but that he never inquired as to its amount or the manner in which it occurred, but merely advised William N. Boggs to see his friends and relations with a view of making good the defalcation. William N. Boggs, on the contrary, testified to the effect, that he made upon that occasion a full disclosure of the amount of the defalcation. In view of the character of the consultation, it is for you to determine which of them is to believed in this regard. The defendant testified in effect that when he made overdrafts in his account at The First National Bank of Dover he was notified from time to time to make his account good either by William N. Boggs or some other officer of the bank. Both Harry

A. Richardson, the president, and John H. Bateman, the cashier of the bank, testified to the effect that they had been in entire ignorance of the holding out of checks drawn by the defendant upon that bank, as charged in the indictment, until after the discovery of the defalcation in June, 1897. If Mr. Richardson and Mr. Bateman are to be believed, it would seem to be evident any notification which may have been sent by either of them to the defendant to make good any overdraft in his account could have had relation to nothing else than the overdrafts as shown in red ink on the individual ledger. In fact the defendant has not testified that his overdrafts of which he received notification were other than those which were duly entered as such on the books of the bank. Mr. Richardson testified to the effect that the teller had no right to loan money of the bank or permit overdrafts or to carry any of the alleged fraudulent checks set forth in the indictment. Mr. Bateman testified to the same effect. The defendant testified to the effect that from the time William N. Boggs made known to him the defalcation in November, 1894, until about a week before his flight he, the defendant, never on any occasion had any communication, oral or otherwise, with William N. Boggs touching such defalcation, and he, the defendant, supposed that William N. Boggs had repaid to the bank the amount of his shortage. William N. Boggs, on the contrary, testified to the effect that there were numerous conversations between the defendant and himself during that period with respect to the defalcation. It appears that the defendant's office was next door to the bank; that the defendant continued during the whole of the above period counsel for William N. Boggs, and that he and William N. Boggs saw each other frequently. In view of these circumstances and of the shock with which the defendant, according to his testimony, received the intelligence in November, 1894, of the defalcation of William N. Boggs, which of the two is to be believed? You will, of course, gentlemen, in deciding on the evidence, such questions apply common intelligence and common sense in the light of human experience. William N. Boggs testified to the effect that he had an arrangement with the defendant for the payment of the defendant's checks out of the funds of the bank, and that he paid every check of the defendant out of such funds whether the defendant's account was or was not good for it. The defendant testified to the effect that he believed that William N. Boggs possessed ample means to cover all checks drawn by the defendant upon the bank for the use, benefit and advantage of William N. Boggs. A number of the alleged fraudulent checks set forth in the indictment as it now stands are admitted by the defendant to have been for the use, benefit and advantage of William N. Boggs. Why then should the defendant have drawn such checks upon the bank if you believe that he was either overdrawn or had not sufficient funds to meet such checks, instead of allowing William N. Boggs to apply his own funds, supposed by the defendant to be ample to accomplish the purpose for which the defendant gave his checks. It is admitted that William N. Boggs was a defaulter to the amount of $107,000. The uncontradicted testimony shows that the defend-

ant was, prior to the giving of the alleged fraudulent checks set forth in the indictment, aware that William N. Boggs was a defaulter to the bank. The defendant knew that William N. Boggs was teller of the bank. He also knew, according to the testimony, that William N. Boggs was a gambler and a stock speculator on margins. While the defendant availed himself of his right to testify, he has not stated, nor has any other witness in the case testified, that the defendant did, at any time, make any inquiry of the officials of The First National Bank of Dover as to the fidelity and regularity of William N. Boggs as teller. Is there or not any explanation, and if so, what is it, of the association, if it has been proved, of the defendant with William N. Boggs in check transactions set forth in the indictment as it now stands, after the defendant had become aware that William N. Boggs had been a defaulter to The First National Bank of Dover? This is for your consideration. I do not deem it necessary to refer to the subject of corroboration either of William N. Boggs or of the defendant. There has been much documentary evidence as well as oral testimony upon that point which is fresh in your recollection. Testimony has been adduced for the purpose of contradicting William N. Boggs and the defendant. The effect of this testimony is for your determination alone. It has been so recently delivered that I do not fell called upon, in view of that circumstance, to comment upon it. It is proper that I should add that your verdict in this case should not be controlled by contradictions on minor points, should any such exist, provided the evidence, taken as a whole after making all due allowance for any such contradictions, leads you to a fixed conclusion of the guilt of the defendant. If the evidence so taken shall not satisfy you beyond a reasonable doubt, as already defined, that the defendant is guilty, he should be acquitted. If, however, the evidence does so satisfy you beyond a reasonable doubt your verdict should be guilty. A criminal case involving much testimony and many facts should not be decided upon the probability or improbability of any one point singled out of the evidence; but a proper decision requires due consideration to be given to all the evidence, direct and circumstantial, in the case. Gentlemen, I need hardly remind you that you are fully to understand that all intimations or expressions of opinion by the court upon the evidence in this case or deductions to be drawn from it, while intended to aid you in reaching proper conclusions, do not in the least control you in arriving at your verdict. You are the sole judges of the credibility of witnesses, the weight to be given to their testimony, and the weight and effect of the evidence, whether oral or documentary. While it is the exclusive function of the court to present to you the principles of law applicable to the case, it is your exclusive function to pass upon the facts and the evidence and reach a conclusion, subject to the principles of law as presented by the court. The court has been requested to give you instructions on a number of points of law in the language employed by the counsel in the case. The charge of the court embraces in substance all the propositions suggested by the counsel in so far as those proposi-

tions are, in the opinion of the court, properly applicable to the case.

Your verdict should represent the opinion of each member of your body, after an intelligent and conscientious comparison and consideration in the jury room of the views of the individual jurors. Your investigation of the evidence should be marked with due deliberation, and your minds should remain open to conviction by arguments which commend themselves to your judgment. The very object of the jury system is to secure unanimity through comparison of the views and through arguments among the jurors themselves. If a large majority of the jurors, after deliberation in the jury room, differ in their conclusions with the minority, it is proper for those composing such minority, in view of the fact of such difference, to review the grounds of their own conclusions in order that, if possible, unanimity may be reached in accordance with the principles of law heretofore laid down. But no juror should acquiesce against his individual judgment in the conclusions reached by other jurors, whether constituting a majority or a minority of your whole body. For your verdict must represent the real opinion and judgment of each member of the jury. The guilt or innocence of the defendant is to be determined by you as intelligent and conscientious men, upon the evidence adduced in this case and upon that alone. A grave and solemn responsibility rests upon you. No public clamor, no sentiment of hostility or sympathy, no consideration of consequences which may result from your verdict, should be permitted in any manner to influence your deliberations or control your verdict. If upon all the evidence in the case you are not satisfied beyond a reasonable doubt of the guilt of the defendant on one or more of the counts of the indictment remaining open for your consideration, you should acquit him; but if upon all the evidence in the case you are satisfied beyond a reasonable doubt that the defendant is guilty in manner and form as he stands indicted on some one or more of those counts, you should return a verdict of guilty. If you so find a verdict of guilty it may be a general verdict of guilty or a verdict of guilty as to all or any of such counts now remaining in the indictment, as the evidence shall warrant.

The jury, after a deliberation of seventy-two hours, were unable to agree, and were discharged by the court.