## CRAVENS et al. v. UNITED STATES.
### No. 9235.

Circuit Court of Appeals, Eighth Circuit.
Nov. 28, 1932.

Rehearing Denied Jan. 5, 1933.

Henry S. Conrad and C. H. Kohler, both of Kansas City, Mo. (L. E. Durham, Hale Houts, R. R. Brewster, and Forest Hanna, all of Kansas City, Mo., on the brief), for appellants.

Arch Taylor, of Salina, Kan., and H. C. Doyle, of Kansas City, Mo., for appellant Alice B. Todd.

James A. Wharton, Sp. Asst. Atty. Gen. (W. L. Vandeventer, U. S. Atty., of Kansas City, Mo., and Nugent Dodds, Asst. Atty. Gen., on the brief), for appellee.

Before KENYON, GARDNER, and SANBORN, Circuit Judges.

KENYON, Circuit Judge.

Appellants (herein designated as defendants) were at the time of the matters herein involved, officers of the Kansas City Joint Stock Land Bank (herein called the land bank), which was duly organized under the Federal Farm Loan Act, section 811, chapter 7, title 12, USCA, with a capital stock of $250,000. The bank passed into the hands of a receiver in 1927. Defendant Cravens was president of the bank, and defendant Alice B. Todd, secretary. Defendants, both charged as principals, were convicted upon 88 counts of an indictment charging misapplication of funds and false entries on the books of the land bank with intent to defraud and deceive. All the transactions upon which the indictment is based occurred before the receivership and while defendants were in complete charge and control of the bank.

The statute claimed to be violated is section 31, chapter 245, 39 Stat. 382 (section 984, title 12, USCA), which is as follows:

"§ 984. Any person connected in any capacity with any national farm loan association, Federal land bank, or joint stock land bank, who embezzles, abstracts, or willfully misapplies any moneys, funds, or credits thereof, or who without authority from the directors draws any order, assigns any note, bond, draft, mortgage, judgment, or decree thereof, or who makes any false entry in any book, report, or statement of such association or land bank with intent in either case to defraud such institution or any other company, body politic or corporate, or any individual person, or to deceive any officer of a national farm loan association or land bank or any agent appointed to examine into the affairs of any such association or bank, and every person who with like intent aids or abets any officer, clerk, or agent in any violation of this section, shall be punished by a fine of not exceeding $5,000 or by imprisonment not exceeding five years, or both."

Defendant Cravens was upon the first 44 counts sentenced to five years in the penitentiary, the sentence upon each to be served concurrently. In addition, upon each of the first 15 counts he was fined $1,000. Upon counts 45 to 88 inclusive he was sentenced upon each to one year in the penitentiary, these sentences to be served concurrently, but consecutive to the sentences on counts 1 to 44, and on each of counts 79 to 88 inclusive he was fined $1,000. The total sentence therefore being six years in the penitentiary and a fine of $25,000.

Defendant Alice B. Todd was sentenced to

one year and a day on each of the counts, said sentences to be served concurrently.

There were a number of corporations controlled by defendants having to do with the general situation in which one or both defendants were interested. They are as follows:

(a) The Liberty Joint Stock Land Bank of Salina, Kan., organized in January, 1918, and later, to wit, 1925, consolidated with the Kansas City Land Bank. It will be designated herein as Liberty Bank. Cravens was its president.

(b) The Cravens Mortgage Company, originally a partnership lending money on farm mortgages, comprised of Cravens and his father. It was later incorporated. It turned over its business to the Liberty Bank when it was organized, taking stock for its holdings.

(c) The Kansas City Finance Corporation (herein called the finance company) was incorporated in 1922, as an investment and loan company, dealing in bonds, stock, etc., with a capital of $750,000. It was organized by Mr. Cravens to carry on the same work as the Cravens Mortgage Company had been carrying on "of acting as the producing agent for the land bank." One-half of the capital stock was paid by delivery of 7,500 shares of the stock of the Liberty Bank at $50 per share, making the assets of the finance company presumably $375,000. This stock of the finance company was owned as follows:

| | |
|---|---|
| V. R. Andrus, | 1 share, |
| S. C. Miller, | 1 share, |
| Alice B. Todd, | 7,489 shares. |

These parties constituted the board of directors.

(d) The Missouri Hydro-Electric Power Company (herein called the Hydro-Electric Company), incorporated in 1924, for the purpose of maintaining and operating electric power and light plants. The capital stock was to be 500 shares of no par value, owned as follows:

| | |
|---|---|
| Walter Cravens, | 498 shares, |
| R. W. Street, | 1 share, |
| Walter Eyssell, | 1 share. |

(e) Farmers Fund, Inc., organized in April, 1925, to deal in bonds, mortgages, and securities of all kinds, and to act generally as investment brokers. The capital stock was to be $100,000, 1,000 shares without nominal or par value, which the articles of incorporation recited had been bona fide subscribed. The capital stock was paid by cash in the amount of $8,984.09, and by the transfer to the company of mortgages upon real estate aggregating $91,015.91. From whence the mortgages came does not appear in the record. The shareholders and the number of shares owned were as follows:

| | |
|---|---|
| Walter Cravens, | 998 shares, |
| Alice B. Todd, | 1 share, |
| R. W. Street, | 1 share. |

These parties constituted the board of directors.

Joint-stock land banks, authorized under section 811, title 12, USCA, are for the purpose of assisting farmers in securing long time loans at low rates of interest, the same to be repaid by amortized payments. Under the act bonds can be issued in an amount not exceeding fifteen times the capital stock and surplus, which are placed on the market and the money derived from these sales is used to make loans. The government incurs no responsibility as to these bonds, their payment being determined by the success with which the loans are made and interest collected. They are not commercial banks but are subject to certain restrictions in examinations similar to federal banks.

It does not seem to be disputed that defendants took from the bank large sums of money. In fact it is admitted in the argument. The government claims said sums were wrongfully and unlawfully taken with intent to defraud the bank, and that false entries were made on the books with the same intention. Defendants' theory is that the difficulties arising were due largely to the land deflation in Missouri and Kansas where the land bank had its loans, which commenced about 1920 and resulted in default in payment of interest and amortized assets on many mortgages and required the land bank to take over a large number of farms; that to meet this situation Cravens devised the plan of organizing the Hydro-Electric Company to develop hydro-electric power for use in St. Louis and Kansas City and other sections of the country which would require an eventual expenditure of some thirty million dollars. The project made necessary the acquisition of lands along the Osage river in the state of Missouri, which would be overflowed by the construction of a dam known as the Bagnell Dam. The lands which the land bank had taken over in Missouri and Kansas were to be exchanged for lands within the area which would be submerged by the dam, which lands the Hydro-Electric Company would be compelled to pay for in cash; that this was the purpose of organizing the Hydro-Electric Company; that a con-

tract was entered into between the Hydro-Electric Company and the bank called the trading agreement, providing for said exchange of lands, which will be hereinafter referred to; that the moneys taken, as set forth in the first 33 counts of the indictment by defendants from the bank were used in carrying out this project in a good faith effort to benefit and not injure the bank. It is the contention of defendants that were it not for unwarranted governmental interference they would have worked out this situation to the benefit and possible salvation of the bank. Further, they contend that the original taking was entirely justified and that whatever funds they took were later restored.

We discuss, preliminary to the question of whether the evidence was sufficient to submit to the jury the various counts of the indictment, some questions of importance.

First. Were the constitutional rights of the defendants invaded by an unlawful search and seizure of property of the bank? This question was raised by plea in abatement.

Second. Was there error in empaneling the jury?

Third. Was there error in the cross-examination of defendant Alice B. Todd?

### Unlawful Search and Seizure.

The indictment was returned on August 4, 1927. The plea in abatement was filed November 7, 1927. An amended plea in abatement was filed in April, 1928. The government contends these pleas came too late, neither the plea nor the amended plea stating any reason for delay. We realize that such an argument can be based on Agnew v. United States, 165 U. S. 36, 17 S. Ct. 235, 41 L. Ed. 624, but serious constitutional rights being here involved we prefer to pass on the merits of the question raised.

Three sets of circumstances are involved in the alleged unlawful search and seizure. First, that, following an invasion of the banking rooms of the Kansas City bank in December, 1925, by agents of the government holding commissions as land bank examiners and accompanied by secret service men, certain books, papers, and records of the bank disappeared, later reappeared in the files of the Treasury Department in Washington, and finally were sent back to the office of the United States District Attorney in Kansas City for the purpose of being used in procuring an indictment against these defendants. Second, that on the night of April 24, 1927, a room on the second floor of the build-

ing in which the land bank had its offices was entered by land bank examiners accompanied by secret service operatives and agents of the Department of Justice, and books, papers, and records, including some private papers of defendant Cravens, seized. These records and documents were removed the following day, after the issuance of a subpœna duces tecum. Third, that throughout the months following December, 1925, the books, papers, and records still remaining in the land bank were being examined and milled over by agents of the Department of Justice, acting primarily with the purpose in view of bringing an indictment against these defendants.

The Federal Farm Loan Board has complete authority under the statutes to bestow commissions as land bank examiners upon whomsoever it will, title 12 USCA § 951, and the powers of such examiners are not diminished by the fact of their being accompanied in their operations by representatives of another department of the government. So long as they act within their own powers, evidence secured by them may be diverted to officers of the Department of Justice, cf. United States v. Cooper (D. C. N. D. Iowa) 288 F. 604–611, reversed on other grounds 9 F.(2d) 216 (C. C. A. 8).

It is provided by statute that "the Secretary of the Treasury is hereby authorized to direct and use the Secret Service Division of the Treasury Department to detect, arrest, and deliver into custody of the United States marshal having jurisdiction, any person or persons violating any of the provisions of this section." Title 12 USCA § 986.

One of the very purposes of periodic bank examinations is to detect illegality, and such examinations are not made illegal by the mere presence of agents of the Department of Justice commissioned as land bank examiners and secret service operatives charged along with bank examiners with the duty to enforce the banking laws.

Joint-stock land banks as such are subject to the widest of inquisitorial powers, provided by the very act by which the banks themselves are created. Title 12 USCA § 952; title 12 USCA §§ 481, 484. This does not of course mean that bank examinations are beyond the pale of the Fourth Amendment, but it does mean that a bank which is really a "public institution," cf. Cooley v. Bergin (D. C. Mass.) 27 F.(2d) 930, 931, 933, owes a positive duty to co-operate in its own examination. It is seldom that a complaint of a violation of the Fourth Amend-

266

ment arising out of such examination arises. In Federal Trade Commission v. American Tobacco Co., 264 U. S. 298, 306, 44 S. Ct. 336, 337, 68 L. Ed. 696, 32 A. L. R. 786, Mr. Justice Holmes conceded, with regard to a limitation the Supreme Court had imposed on the inquisitorial powers of the Federal Trade Commission over ordinary private corporations, that "the question is a different one where the State granting the charter gives its Commission power to inspect."

We have been able to discover but one case of a prosecution under the national banking laws where the question of unlawful search and seizure was so much as raised, and in that case, Bacon v. United States (C. C. A. 8) 97 F. 35, the search and seizure complained of had occurred while the bank in question was a state institution.

We entertain considerable doubt as to whether there was any real illegality in any of the circumstances complained of in the instant case, so far as the books, papers, or records of the land bank are concerned. Certainly there was no taint of illegality about the third set of circumstances complained of, viz., the examining of records which was carried on at the bank itself. Conceding however some "irregularity" to the sending of the bank's books, papers, and records to the Treasury Department in Washington, and to the seizure made on the night of April 24, 1927, there are reasons why defendants are thereby afforded no ground of reversal.

■ Defendants of course could raise the question of illegal search with reference to their own private papers (referred to later), but whether they could raise it with respect to the papers and records of the bank is not so clear. The rule is well settled that the only ones who can object to the use of evidence illegally procured are those whose property rights therein have been invaded. Cooper et al. v. United States (C. C. A. 8) 9 F.(2d) 216; Fuller v. United States (C. C. A. 2) 31 F.(2d) 747; Wida et al. v. United States (C. C. A. 8) 52 F.(2d) 424; United States v. Hoyt (D. C. S. D. N. Y.) 53 F.(2d) 881; Occinto v. United States (C. C. A. 8) 54 F.(2d) 351; Kelley v. United States (C. C. A. 8) 61 F.(2d) 843 (opinion filed October 31, 1932); Hale v. Henkel, 201 U. S. 43, 26 S. Ct. 370, 50 L. Ed. 652; Wilson v. United States, 221 U. S. 361, 31 S. Ct. 538, 55 L. Ed. 771, Ann. Cas. 1912D, 558; Wheeler v. United States, 226 U. S. 478, 33 S. Ct. 158, 57 L. Ed. 309; Grant v. United States, 227 U. S. 74, 33 S. Ct. 190, 57 L. Ed. 423; Essgee Co. of China v. United States, 262 U. S. 151, 43 S. Ct. 514, 67 L. Ed. 917.

Under the authority of Silverthorne Lumber Co. v. United States, 251 U. S. 385, 40 S. Ct. 182, 64 L. Ed. 319, 24 A. L. R. 1426, there may be doubt as to whether the bank records and papers could be used against defendants, they being apparently in the control and possession of the bank and its records as managing officers thereof. That case however does not overrule the doctrine of Wilson v. United States, 221 U. S. 361, 31 S. Ct. 538, 55 L. Ed. 771, Ann. Cas. 1912D, 558, as applicable to situations under the Fourth Amendment. It is unnecessary however to determine this question, in view of this record. Assuming that it can be raised by defendants, it appears from the only evidence introduced upon the question that none of the books, papers, or records, as to the seizure of which illegality is charged, was made use of in any way in the procuring of the indictment against these defendants.

The only testimony dealing with what records were used, or were not used, in the procuring of the indictment, is that of Mr. Nugent Dodds, Special Assistant to the Attorney General, who had charge of the preparation of the case and was instrumental in the prosecution of defendants, and Mr. S. C. Bennetts, accountant of the Department of Justice who assisted Mr. Dodds. It seems necessary to set out considerable of Mr. Dodds' evidence.

In answer to the question of what records were used before the grand jury he replied: "The books and records of The Kansas City Joint Stock Land Bank, the general ledgers, check registers, disbursement journals, and such general books of account of the Land Bank were used before the grand jury and were the basis of this indictment." He testified also that "the records we took before the grand jury were the books and records of The Kansas City Joint Stock Land Bank, namely the ledgers of the bank, general ledger, each of the papers mentioned in the individual counts in the counts of the indictment, such as checks, and one thing and another, that were taken from the files of the Land Bank the day that the grand jury—or a few days before, I believe—they were never over here that I know anything about; certain cancelled checks; the check register of the Land Bank; the individual mortgage records; record books; various of them, of the Land Bank receipts and disbursement journals, all being books in possession of the receiver of the Land Bank when he took the bank over."

When asked when he came into possession of the records that were used before the grand jury he replied: "I went to the Land Bank

and examined them. They were there at all times until the grand jury was called. * * * The records we used for the grand jury were records taken by subpoena from the receiver of the bank, I believe, and had always remained in the bank. The ledgers and check registers and such books as that."

With reference to records that were not used, the following colloquy occurred between Mr. Dodds and the examining counsel, Mr. Conrad:

"Q. Did you use any other records, to your knowledge? A. No, sir, I don't believe any other records were used, except records of the Land Bank.

"Q. No Missouri Hydro-Electric records were used? A. No, I don't believe the Missouri Hydro-Electric records were used; but I would want to consult with some of my assistants before I could be sure.

"Q. You have read the plea in abatement? A. Yes.

"Q. Was the records of any of the corporate entities mentioned in the plea in abatement used before the grand jury? A. No, sir, I don't believe that they were.

"The Court: None of the records referred to in the plea in abatement you say were used? A. They have here an exhibit attached to the plea in abatement in which they named a great many records. I have looked that over and I can't remember that any record, document or paper was used before the grand jury, and I am satisfied it wasn't."

Mr. Dodds added: "May I make myself clear on this, that as to these papers that I saw here none of them were ever introduced before the grand jury nor did I ever use any of them myself in getting the data for these cases. They are disconnected and I have no memory of there ever being any connection between them and the indictment in question whatsoever. I am satisfied there wasn't."

At the conclusion of all the testimony directed to the question of unlawful search and seizure, Mr. Dodds again took the stand and made the following statement:

"When I testified this morning, if the court please—since I testified this morning, I have looked over and tried to refresh my recollection as to the use of divers of the documents that are mentioned in the plea in abatement, in the amended plea in abatement. I would say this to the court: The accountants here, in the matters upon which the August 4th indictment is based, had been working under my immediate direction and guid-ance in order to develop the matters that are contained in that indictment, both before the indictment was brought and afterwards. I do not believe and I am as morally certain as anyone could be, Your Honor, that nothing whatsoever among the papers that are listed in the amended plea in abatement had anything to do with the development of the matters that are contained in the August 4th indictment. The investigation that brought out the facts that are covered by the August 4th indictment was the investigation of the books, records and documents of the Land Bank that were in the Land Bank. * * *

"None of the books, records or documents that were taken from the room on the second floor were actually used before the grand jury and I don't believe that there was anything in any of those books, records or documents on the second floor that had any bearing upon or furnished any clews or leads to the matters that are contained in the indictment. The matters that are contained in the indictment were covered by documentary evidence taken from the bank itself under subpoena and in each instance made, as I remember it, a prima facie case as to the count as to which each of the documents referred. * * *

"There was no count—I kept track of it through the case and through the presentation to the grand jury—I followed the schedule in the first place and kept track of it in the second place, as the proof went in and there was no essential element of proof that was missing and, may it please the court, entirely independent of documents seized from the second floor and the documents that came here from Washington and, as I have stated before, I know of no lead or clews of any kind that developed from either of those sets of documents. The examiners who examined the Land Bank were, in so far as I know, always authorized by the Federal Farm Loan Bank, as Mr. Sheehan and Mr. Madland and the last witnesses and all the previous witnesses spoken of were and their commissions were put in evidence this morning."

With respect to any private papers of defendant Cravens that may have been taken, Mr. Dodds testified as follows: "The day those records were taken, Mr. Brewster called me up and told me they had included some unlabeled boxes, two unlabeled boxes that contained personal letters of Mr. Cravens and Mr. Brewster asked me whether I would be willing to return those letters if he should convince me they were Mr. Cravens' property. I told him I would gladly do it. The government had no interest in Mr. Cravens'

private affairs. Mr. Brewster came to the Federal Building and opened two boxes in my presence and held up a couple of papers and showed me they were personal papers of Mr. Cravens and I don't know whether we made any further examination than that but, anyway, he assured me they were Mr. Cravens' personal papers and we closed and locked the boxes and we gave them to Mr. Brewster and he took them away. Outside of that I have never seen a letter or personal paper that belonged to him that was his personal papers."

When Mr. S. C. Bennetts, accountant of the Department of Justice who assisted Mr. Dodds in preparing the indictment, took the stand, the following colloquy occurred between him and Mr. Dodds as examining counsel:

"Q. And I will ask you whether when that matter was presented to the grand jury on August 4th, to your knowledge, whether any books, records and paper we got that night were used at all? A. So far as the documents, books, records and papers that I personally testified about to the grand jury, not a single one.

"Q. In the preparation of our case in the August 4th indictment, I will ask you whether we had any occasion to use those papers and books and records that were procured by that subpœna, that were found there that night in the bank room? A. No, sir.

"Q. They didn't have anything to do with our August 4th case? A. No.

"Q. And whether or not on August 4th, anything was worked up entirely from the books, records and documents of the bank which you examined there assisted by Mr. Tull? A. Every count in the indictment is on that basis.

"Q. And the books, records and documents—you attempted to bring them over for the grand jury? A. I think Mr. Miller and I brought them, if I remember right.

"Q. You and I agreed in advance what we were going to use before the grand jury? A. I didn't get that.

"Q. We prepared the case together? A. Yes.

"Q. Do you know of having gotten any clews or leads from that evidence that was subpœnaed at that time that had anything to do with the August 4th case? A. No, I do not.

"Q. Do you know of having gotten, or did you get any evidence or leads or clews from the papers that came to you from the Treas-ury Department upon which any accounts of the August 4th case were based? A. Not from the Treasury Department.

"Q. So that neither of the bunches of documents that counsel has mentioned here today were the basis of our August 4th indictment or of the former indictment for that matter, were they? A. No."

[5, 6] In the light of the above testimony we are unable to disturb the finding by the District Court that is implied in its overruling of the defendants' plea in abatement to the indictment, viz., that none of the books, papers, or records concerning the seizure of which there was the least taint of illegality was used in any way in the procuring of the indictment against the defendants. Furthermore, in the light of former rulings by this court, it would not have been material had such books, papers, or records been so used, so long as there was competent additional evidence, legally procured, and without taint, on which to base the indictment. In United States v. Cooper (D. C. N. D. Iowa) 288 F. 604, internal revenue agents in the course of an investigation had come upon evidence of criminal conduct and had turned such evidence over to officers of the Department of Justice, who proceeded to have an indictment brought against the defendants. The evidence so seized, and all of which was used in procuring the indictment, consisted in part of corporate records, which the court held to have been lawfully seized, and in part of the private books, papers, and records of the several defendants, which the court held to have been unlawfully seized, in violation of the Fourth Amendment. The court nevertheless overruled the plea in abatement to the indictment, saying, at page 611 of 288 F.: "In view of the conclusions reached the demurrers to the pleas in abatement must necessarily be sustained as the pleas concede that a very substantial part of the evidence used before the grand jury was made up of evidence other than the private books, papers and documents of the defendants."

In support of the above ruling the court cited, among other authorities, the case of Anderson v. United States (C. C. A. 8) 273 F. 20, 29, where it was claimed illegal evidence was used before the grand jury. The court said: "There may have been other sufficient and competent evidence supporting the action of the grand jury in finding the indictment. It therefore becomes, as we think, unnecessary to decide the question as to whether the seized papers could appropriately be used at the inquest. We understand the

rule to be that an indictment cannot be set aside or avoided on such an objection unless it affirmatively appear that there was no evidence of the commission of the offenses presented to the grand jury, or unless all of the evidence which it heard on the inquiry was unlawfully procured in violation of some fundamental right of the party indicted, and which would be barred on the trial as incompetent and inadmissible against him."

While United States v. Cooper, supra, was reversed by this court in Cooper v. United States (C. C. A. 8) 9 F.(2d) 216, the reversal went only to the sufficiency of the evidence to sustain the conviction and not to the District Court's ruling with regard to the plea in abatement to the indictment. Such ruling in the latter regard was in fact expressly sustained in the following language of this court at page 220 of 9 F.(2d):

"At the threshold it is claimed that the indictment should have been quashed because of the alleged submission to the grand jury of certain private books and papers of the defendants unlawfully seized, in violation of the Fourth Amendment, and that at the trial such evidence, and information elicited from clues derived therefrom, were introduced, contrary to the provisions of the Fifth Amendment. To this contention it may be answered that there was no such search and seizure as is contemplated by the constitutional prohibition. Government officers, under the applicable revenue law, demanded access to the books and papers of the corporation, in order to verify or discredit the returns it had made, and neither force, threats, nor other objectionable methods were employed. The corporation, without objection, answered and complied with the demand for inspection and examination and aided and participated therein. It was compelled by law to make the disclosures that were made, and could not, of course, make this objection in any case; nor can plaintiffs in error, as officers of that corporation, plead it in their own behalf. Information thus gleaned may always be used in the prosecution of individuals responsible for the violation. Besides, there was before the grand jury other substantial evidence conceded to be competent and free from taint. Therefore, under general authority, the indictment is not vulnerable on this ground."

See, also, Radford v. United States (C. C. A.) 129 F. 49; McGregor v. United States (C. C. A.) 134 F. 187; McKinney v. United States (C. C. A.) 199 F. 25; Chadwick v. United States (C. C. A.) 141 F. 225; Holt v. United States, 218 U. S. 245, 31 S. Ct. 2, 54 L. Ed. 1021, 20 Ann. Cas. 1138.

It is urged in argument that some of those alleged to have been engaged in the claimed illegal search were armed, and that the janitress of the building was coerced to open the doors of the room connected with a part of the bank. We find no evidence of any coercion of the janitress. Miss Todd did testify that some of the men were armed but did not claim any coercion. Just who was armed is not very clear in the record, but there was no attempt to coerce any one by force or threats.

No question seems to be made in the instant case with any seriousness at least, of the use of illegally procured evidence at the trial. We have found nothing in the record to indicate that any of the documents sent to Washington or seized on the night of April 24, 1927, were among the documents introduced in evidence at the trial.

There being in our judgment ample legal evidence on which to base the indictment procured against the defendants, it is unnecessary to determine the actual validity of the seizure of evidence which not only was not needed, but was actually not used in the securing of the indictment. The burden was on defendants to show that the indictment was based on illegal evidence. That has not been shown. We conclude herein, as we did in Cooper v. United States, supra, that there is no reason for us to disturb the judgment on the ground of the alleged unlawful seizure of evidence preliminary to the indictment.

### Empaneling of Jury.

Was there error in this? On the day the case was called for trial, but before it was actually called, it appeared there would not be a sufficient number of jurors present to constitute the panel of twenty-eight rendered necessary by the provision for peremptory challenges. Judicial Code, § 287, 28 USCA § 424. To take care of this situation the court directed the marshal to summon ten additional jurors from among the bystanders in the courthouse or in the immediate vicinity of the courthouse.

When the case was called for trial the court directed the clerk to call a jury of twenty-eight men, calling from the regular jury panel until that should be exhausted. The clerk did so and twenty-three jurors responded to the call. The court then directed the marshal, in accordance with section 280 of the Judicial Code, 28 USCA § 417, "to summon from among the bystanders in the court room five additional jurors." Thereafter six members of the panel were challenged and excused for cause, and six additional bystanders were called from the

courtroom to take their places. All this was done over the defendants' objection, which was to the fact that the so-called "bystanders" had been provided in advance of the case being called for trial by the first order of the court to the marshal.

Eight members of the jury that tried defendants were from the so-called "bystanders" or talesmen, while four were from the regular panel of twenty-three. It later appeared that the persons summoned to act as bystanders pursuant to the order of the court were selected in part from lists of prospective or soliciting jurors kept by the marshal and his deputies, and in part by the marshal from various business houses about the city. In selecting men from the various business houses the marshal testified that his practice was as follows: "I went in the place of business and went to the manager and told him I was going to take a man out of there for a juror, and I would let him pick the man if he wanted to, but I told him I wanted a man that looked to me like he would make a good juror, and if the man he picked didn't suit me, I would pick another." In one instance he "went to the assistant manager and told him I wanted to take a man for jury service, that he could designate the man that would disorganize the firm the least, and if he looked good I would take him, and if he didn't I would take another one, and the man he picked I didn't like so I picked another one." It is not claimed the procedure resulted in any prejudice to defendants but it is claimed that the jury selected in this way was not a legal one.

We are unable to find reversible error either in the order of the court or in the way in which the order was carried out. The purpose of the court in anticipating a failure of the regular panel and directing the summoning of bystanders in advance of the calling of the case for trial was both to save time and to assure the availability as jurors of other persons than the usual courtroom habitues. This did not amount to the court's "handpicking" the jurors—they were still to be selected as well as summoned by the duly authorized officers for that purpose, viz., the marshal. In this respect the instant case is sharply distinguishable from both Gideon v. United States (C. C. A. 8) 52 F.(2d) 427, and Rhodman v. State, 153 Miss. 15, 120 So. 201, relied on by defendants.

▮ Nor was the order of the court in violation of section 280 of the Judicial Code, § 417, title 28, USCA, which reads as follows: "When, from challenges or otherwise, there is not a petit jury to determine any civil or criminal cause, the marshal or his deputy shall, by order of the court in which such defect of jurors happens, return jurymen from the bystanders sufficient to complete the panel; and when the marshal or his deputy is disqualified as aforesaid, jurors may be so returned by such disinterested person as the court may appoint, and such person shall be sworn, as provided in section 416 of this title."

The above provision, as section 804, Revised Statutes, was construed in United States v. Loughery, 13 Blatchf. 267, 26 Fed. Cas. 998, No. 15,631, with reference to exactly the same thing that was done in the instant case, except that it was there done after the case had been called for trial. The court said, referring to said section 804: "In this case, the point taken is, that the persons summoned by the marshal, in pursuance of the order of the court, were not bystanders, because not in court when summoned by the marshal. But, these persons were present in court when they were returned by the marshal as present, and when their names were placed upon the panel, and their ballots placed in the wheel; and the statute is complied with, if the persons returned by the marshal are present in court when so returned. How long they had been present, or how they happened to be present, is of no consequence, provided no fraud or collusion or improper action is suggested. At common law, the duty of selecting jurors belongs to the sheriff, and it would seriously embarrass trials if it were held that, when a panel fails by reason of challenges, and talesmen are ordered, the marshal is bound to return the talesmen from those who happen, at the instant of making the order, to be present in court. * * * They may be persons whose presence has been secured by the accused in anticipation of a failure of the panel. 'Persons, who are not bystanders in the court, may be summoned as talesmen, for, when they come in, they are bystanders.' 5 Bac. Abr. 'Juries,' p. 337."

The trial court in passing on the motion for new trial observed that it had always been the practice in the district in similar situations to summon jurors not only from the courtroom but from the immediate vicinity. That "there were not in the court room, in my judgment, at the time the regular jury panel was first qualified on that date, any persons fit to be jurors except those on the regular panel. In fact it appeared those in the court room outside of those on the case and in the regular panel were witnesses who had been

summoned in the case; and it would have been impossible at that time before this case was called for trial at the opening hour of court on that day to have found anyone in the court room itself who was qualified to sit as a juror."

In the carrying out of the court's order the marshal had a certain amount of discretion. There is no evidence of his having abused it. It appears that he selected the talesmen in this case by the same procedure that he ordinarily followed in similar circumstances. There is a presumption that the marshal will do his duty without favor, unless it affirmatively appears that he "is not an indifferent person, or is interested in the event of the cause." Section 279, Judicial Code, 28 USCA § 416. In the latter event it becomes the duty of the court to appoint an indifferent person in the marshal's stead, to select the talesmen. Section 280, Judicial Code, 28 USCA § 417, supra. Thus where it affirmatively appeared that the marshal had himself been active in the detection and prosecution of the defendants to be tried, it was held that he was "not a fit person to be intrusted with the power to return jurymen from bystanders to complete the panel for the immediate case," and that the court should have, in conformity with section 280 of the Judicial Code, supra, appointed an indifferent person to act in his stead. Johnson v. United States et al. (C. C. A. 9) 247 F. 92, 95. But the marshal is not an adjunct of the District Attorney's office, and, unless circumstances of the above sort affirmatively appear, he will be presumed to have acted indifferently.

Defendants do not charge any fraud or corruption or improper conduct of the marshal, but do charge that this procedure resulted in the "packing" of the jury by the government against the accused. The mere fact that jurors are summoned by the marshal and paid by the government does not make them "government men" on a jury. There is no evidence of any "packing" of the jury.

Nor was it necessarily reversible error for the marshal to summon as talesmen men who had previously given their names to the marshal or his deputies as being available for jury service. There is not the slightest evidence that the jurors so chosen were so much as known to the District Attorney's office, or that the motives prompting their availability for jury service, whether financial or otherwise, were in any way inconsistent with the utmost fairness on their part to the defendants. It is an era when many honest and capable men are glad of the opportunity to earn jury fees.

Most of the cases cited by defendants involve either positive misconduct or the clear-cut violation of an applicable state statute. In the instant case there is no evidence of misconduct on the part of any one, and we are unable to find any violation of either the spirit or the letter of the applicable federal statutes. We think the trial court did the sensible and proper thing under the circumstances.

### Cross-Examination of Defendant Alice B. Todd.

Counsel for the government sought to have Miss Todd testify on her cross-examination that the $221,351.44 which she reported to the Farm Loan Board as being on deposit in the First National Bank at Kansas City was not in fact so deposited, and then endeavored to compel her to answer yes or no as to whether said entry was a true or false one. This occurred:

"Q. When you reported to the Farm Loan Board that there was $221,000.00 odd dollars on deposit in the First National Bank of Kansas City, $221,351.44, that was not actually on deposit in the First National Bank of Kansas City, was it, Miss Todd? A. The amount was not actually on deposit in the First National Bank of Kansas City, on that date.

"Q. And it wasn't on this date that you made the report to the Board, was it? A. Probably not.

"Q. It wasn't when you made the report of November 24? A. I think not."

The witness was unwilling to admit any false statement in the report or in the entry on the bank books, and after prolonged controversy between the witness and counsel for the government and after she had repeatedly been asked the question as to whether the entry she had spoken of as being put in the report by her of the deposit in the First National Bank was a true or false entry, she refusing to answer directly, this occurred:

"The Court: The witness can certainly answer if she drew up this report, whether the statement contained therein is true or false.

"Mr. Conrad: Exception please. (To which ruling of the court the defendants by their counsel then and there duly excepted at the time and still except.)

"Q. The court says for you to state whether this statement was true or false.

"The Court: It is one or the other. A. The statement is incorrect, based on the books.

"Q. I didn't ask you that. I asked you whether the statement in the book was true or false. Answer it please. I insist on an answer.

"The Court: Answer the question, Miss Todd.

"Q. You were the secretary of the bank. A. The statement was incorrect.

"Mr. Dodds: The witness hasn't answered the question, may it please the court.

"The Court: Answer the question. A. May I ask Your Honor a question?

"The Court: Yes. A. After I have answered this question, may I explain it?

"The Court: Yes.

"Q. Answer it.

"Mr. Conrad: Exception. (To which ruling of the court the defendants by their counsel then and there excepted at the time and still except.)

"Q. Is the statement made therein true or false? A. The statement may be admitted to be false as reflecting the actual deposit—

"Q. Now, Miss Todd—

"Mr. Conrad (interrupting): We object to him interfering with the answer, now.

"The Court: Yes. A. But the bank held in its possession not only Mr. Cravens' check for the amount, but the collateral pledged to that check of value equal to the sum shown on deposit."

In the District Court's thus permitting the government to force Miss Todd to admit the falsity of the statement contained in the report to the Federal Farm Loan Board, defendants contend that reversible error was committed, in that (a) the inquiry was without the scope of proper cross-examination; (b) it called for a conclusion, thus invading the province of the jury; (c) it related to a crime for which she was not indicted; and (d) Miss Todd was thus forced to incriminate herself in violation of the Fifth Amendment to the Constitution.

■ If the inquiry was proper cross-examination, there is nothing to the contention that defendant Todd was forced to incriminate herself in violation of the Fifth Amendment. For she had already taken the witness stand in her own behalf and waived her immunity under the Fifth Amendment. Raffel v. United States, 271 U. S. 494, 46 S. Ct. 566, 70 L. Ed. 1054.

■ The rule as to the limitation of cross-examination of a defendant who testifies is well settled in this circuit. The same limitation applies as to any other witness, and a defendant subjects himself to cross-examination as to the facts in issue inquired about in direct examination exactly the same as any other witness and to no greater extent. Harrold v. Oklahoma (C. C. A. 8) 169 F. 47, 17 Ann. Cas. 868; De Witt v. Skinner (C. C. A.) 232 F. 443; Tucker v. United States (C. C. A. 8) 5 F.(2d) 818; Gideon v. United States (C. C. A. 8) 52 F.(2d) 427; Salerno v. United States (C. C. A. 8) 61 F.(2d) 419, (opinion filed October 26, 1932); Clark v. United States (C. C. A. 8) 61 F.(2d) 695 (opinion filed October 20, 1932).

■ Did this cross-examination bear on testimony given by her on direct examination? Miss Todd was the main witness for the defendants, and was examined at great length upon the direct examination. Her evidence covers nearly every phase of the numerous transactions involved. Mr. Cravens' examination was very brief in comparison. In fact his counsel in questioning him stated, "the counts in this indictment from the first to the last have been covered by the testimony of Miss Todd." Miss Todd was asked on direct examination: "Miss Todd, I want to ask you this question: Tell this jury whether you at any time ever made an entry on the books or took part in any kind or character of transaction involved in these counts or otherwise with any intent to defraud this bank out of a penny of money in any way whatsoever?" She answered: "I did not." She was asked: "Do you know of your own personal knowledge of any act or anything done by Mr. Cravens, of the receipt of any money by him in reference to or from this bank with the intention in any way of depriving or defrauding this bank of a penny?" She answered: "I certainly do not." She was asked: "Tell the jury whether or not you yourself, or of your own knowledge, there was ever an entry made upon the books of this bank at any time for the purpose of deceiving any person whomsoever." She answered: "No, sir." Finally she was asked: "Do you know of any entry having been made by any person, including Mr. Cravens, or his knowledge of any transaction which had for its purpose deceiving any individual, whether farm loan examiner or whomsoever he might be—of deceiving him in any respect whatsoever?" She answered: "I do not."

This testimony on direct examination opened the door to a very wide cross-examination. The falsity of the statement in the report to the Federal Farm Loan Board

had a very direct bearing, not only upon the issue of intention to deceive, but upon the falsity of the entries in the books of the land bank from which the statement in the report was made up, and which entries formed the direct basis of several of the counts in the indictment.

 It thus follows that defendant Todd was neither subjected to improper cross-examination nor forced to incriminate herself in violation of the Fifth Amendment. It is to be noted also that the privilege against self-incrimination was not raised at the trial. No objection to the testimony was made on that ground—hence the protection of the Fifth Amendment which is personal was waived and cannot now be urged. In re Knickerbocker Steamboat Co. (D. C.) 139 F. 713; United States v. Skinner (D. C.) 218 F. 870; United States v. Elton (D. C.) 222 F. 428; United States v. Hoyt (D. C. S. D. N. Y.) 53 F.(2d) 881; Brown v. Walker, 161 U. S. 591, 16 S. Ct. 644, 40 L. Ed. 819; Kolbrenner v. United States (C. C. A. 5) 11 F.(2d) 754; United States ex rel. Vajtauer v. Commissioner of Immigration, 273 U. S. 103, 47 S. Ct. 302, 71 L. Ed. 560.

 Nor do we find error in the fact that the inquiry on cross-examination may have brought to light criminal conduct other than that for which defendants were indicted, the inquiry being logically relevant to the subject-matter of the direct examination. Raffel v. United States, 271 U. S. 494, 46 S. Ct. 566, 70 L. Ed. 1054. The general rule as to proof of other crimes has been stated by this court many times. Thus we said in Cook v. United States (C. C. A. 8) 28 F.(2d) 730, 732: "As a general rule, evidence of other crimes is inadmissible, but to this rule there are certain well-recognized exceptions. It does not apply where the evidence of another crime tends directly to prove the crime charged, and evidence which is relevant to defendant's guilt is not rendered inadmissible because it proves or tends to prove him guilty of another separate and distinct crime. It often happens that two distinct offenses are so inseparably connected as in the instant case that the proof of one necessarily involves proof of the other, and in such case on the prosecution for one, evidence proving it should not be excluded because it also proves the other." In Levy v. United States (C. C. A. 8) 35 F.(2d) 483, 485, this court said: "The mere fact that the evidence in a chain of circumstances may show crimes other than the one for which the party is on trial is not sufficient to exclude the same."

In Doyle v. United States (C. C. A. 8) 33 F. (2d) 265, 266, we pointed out: "Three cases in this circuit—McMillan v. U. S. (C. C. A.) 27 F.(2d) 94; Anderson v. U. S. (C. C. A.) 18 F.(2d) 404, and Cook v. U. S. (C. C. A.) 14 F.(2d) 833—have passed on this question. They hold that evidence of distinct offenses, independent of those charged in the indictment or information, is competent only where intent is an essential ingredient of the crime charged, except where they are so related to the main issue, or are part of the surrounding circumstances in respect to time and character, as to aid in its solution, and that considerable discretion is allowed the trial judge in deciding whether such evidence tends in some degree, at least, to corroborate the other evidence."

In Caldwell v. United States (C. C. A. 10) 36 F.(2d) 742, the facts were just the reverse of the facts in the instant case, in that there the court admitted evidence of false entries in the books of the bank, for which the defendant was not on trial, as bearing on whether or not he had made a false entry in a report to the comptroller, for which he was on trial. At pages 744, 745 of 36 F.(2d) the court said: "Complaint is made concerning the admission of evidence as to false entries in the sum of $120,000, in the books of the bank, 16 days prior to the false entry of the same amount in the report to the comptroller charged in the indictment. As a part of the transaction, the government had a perfect right to show that the defendant first falsified the books of the bank, and then falsified the report to the comptroller to correspond. This assignment is entirely without merit." Bettman v. United States (C. C. A. 6) 224 F. 819; Galbreath v. United States (C. C. A. 6) 257 F. 648; Astwood v. United States (C. C. A. 8) 1 F.(2d) 639; Arnold v. United States (C. C. A. 7) 7 F. (2d) 867, 871; Niederluecke v. United States (C. C. A. 8) 21 F.(2d) 511.

The testimony of defendant Todd concerning the falsity of the statement in question was not rendered inadmissible for the reason that it tended to prove defendants guilty of another separate and distinct crime.

 The only remaining question in connection with the testimony of defendant Todd is whether it was error, as calling for a conclusion and thereby invading the province of the jury, to confine her to the words "true" or "false" in answering the question concerning the statement in the report to the Federal Farm Loan Board.

In view of the entire record we do not

274

deem this question of much importance, for it conclusively appears from the testimony that no prejudice could have resulted from her being compelled to answer the question, as she finally did, because she had fully and in detail explained all the facts and circumstances and had put her own interpretation upon the term "false" as used by her.

### Sufficiency of Evidence.

Strong argument is presented here on the proposition that the evidence was insufficient to sustain the verdict of the jury upon each of the numerous counts. We cannot be concerned with the credibility or weight of the evidence, or the plausibility of defendants' explanations. It is not our function to determine the guilt or innocence of defendants. That is for the jury. It is well established in this circuit that, if the government's evidence on any particular count is as consistent with innocence as it is with guilt, it is insufficient to sustain the verdict, and that question demands our attention. Turinetti v. United States (C. C. A. 8) 2 F.(2d) 15; Ezzard v. United States (C. C. A. 8) 7 F.(2d) 808; Bishop v. United States (C. C. A. 8) 16 F.(2d) 410; Dickerson v. United States (C. C. A. 8) 18 F.(2d) 887; Van Gorder v. United States (C. C. A. 8) 21 F.(2d) 939; Philyaw v. United States (C. C. A. 8) 29 F.(2d) 225; Gold v. United States (C. C. A. 8) 36 F.(2d) 16; Peightel v. United States (C. C. A. 8) 49 F.(2d) 235.

The indictment with its 88 counts covers 192 pages of the printed record. The evidence is voluminous. These counts may be conveniently divided into two groups. One may be termed the misapplication counts and the other the false entry counts. The misapplication counts are 1 to 33 inclusive, which involves some $133,922.61; counts 54, 55, 56, and 57, involving $53,276.59; 72 to 80 inclusive involving $78,354.22, making a total of 46 counts, involving $265,553.42 of alleged misapplication by defendants of the land bank's funds.

The false entry counts are 34 to 53 inclusive, involving $718,543.15; 58 to 71 inclusive involving $9,440.09; 81 to 88 inclusive involving $20,804.84, a total of 42 counts involving $748,788.08 of alleged false entries on the books of the land bank.

Count 1 of the indictment, which we take as typical of the first 33 counts, set forth that Walter Cravens was a director and officer, to wit, president of the Kansas City Joint Stock Land Bank, and was also financially interested and engaged in the promotion and development as director and officer, to wit, president of the Missouri Hydro-Electric Power Company, operating and doing business in connection with and incident to the development of a power project in said state of Missouri, which was a speculative and financially uncertain venture; that he was also interested financially, and a shareholder, in the Kansas City Finance Company, a corporation of the state of Missouri, engaged in buying and selling securities of divers sorts and kinds, and was engaged at the times mentioned in the indictment in assisting in the promotion of said Missouri Hydro-Electric Power project; that Alice B. Todd was secretary of said Joint Stock Land Bank; that Walter Cravens and Alice B. Todd were actively engaged in conducting, directing, managing, and supervising the business of said Joint Stock Land Bank, and possessed of power and control, direction and management over its moneys, funds, and credits, and that "they, said Walter Cravens and said Alice B. Todd, with intent on their part and upon the part of each of them to injure and defraud said joint stock land bank, certain of the moneys, funds and credits of said joint stock land bank then and there being to the amount and of the value of, to-wit, $1,189.30, unlawfully and feloniously did wilfully misapply by unlawfully, feloniously, wilfully and fraudulently and not for any use, benefit or advantage of said joint stock land bank, converting and applying that sum of moneys, funds and credits of said joint stock land bank to the use, benefit and advantage of the said Missouri Hydro-Electric Power Company, and to the use, benefit and advantage of said Kansas City Finance Company and to the use, benefit and advantage of said Walter Cravens as the owner of divers shares of the capital stock of said Missouri Hydro-Electric Power Company and of said Kansas City Finance Company, and by reason of his financial interest in the promotion and development of the said water power project of the said Missouri Hydro-Electric Power Company, and to the use, benefit and advantage of divers other persons, firms and corporations to the grand jurors unknown, which said conversion and misapplication of the said sum of the moneys, funds and credits of said joint stock land bank was then and there accomplished by said Walter Cravens and said Alice B. Todd in the manner following, that is to say: by virtue of the power of control, direction, management and supervision which said Walter Cravens and said Alice B. Todd, then and there, on, to-wit, said July 6, 1925,

had and possessed over the moneys, funds and credits of said joint stock land bank by reason of their connection therewith in the respective capacities hereinbefore stated, they, said Walter Cravens and said Alice B. Todd, then and there, to-wit, at said Kansas City, Missouri, on, to-wit, said July 6, 1925, with the intent aforesaid, did wilfully and fraudulently execute a check of said joint stock land bank, in the sum of $1,189.30, payable to said Kansas City Finance Company, drawn upon the First National Bank, Kansas City, Missouri, and signed by said Walter Cravens and said Alice B. Todd as president and secretary, respectively, of said joint stock land bank, being a check dated July 6, 1925, and designated by the number 31290, and with which said First National Bank, Kansas City, Missouri, said joint stock land bank then and there had moneys, funds and credits, subject to the payment of checks of said joint stock land bank executed by said Walter Cravens and said Alice B. Todd as president and secretary, respectively, thereof, and which said check said Walter Cravens and said Alice B. Todd forthwith delivered and caused to be delivered to the said Kansas City Finance Company, which said Kansas City Finance Company then and there deposited said check to the credit of said Kansas City Finance Company in said First National Bank of Kansas City, Missouri, by which said First National Bank the amount of said check was charged to the account of said joint stock land bank with said First National Bank and credited to said Kansas City Finance Company, which said Kansas City Finance Company forthwith disbursed that sum to divers persons, firms and corporations to the grand jurors unknown in payment to said divers unknown persons, firms and corporations of financial obligations of the said Missouri Hydro-Electric Power Company to said divers unknown persons, firms and corporations, when, as said Walter Cravens and said Alice B. Todd then and there well knew, there was no consideration to said joint stock land bank for the execution and delivery of said check and said check did not represent the payment of any sum then and there owing by said joint stock land bank to the said payee, or to said Missouri Hydro-Electric Power Company, or to any other person, firm or corporation whatsoever, but that, on the contrary, said check was, in truth and in fact, so executed and delivered in order to accomplish and effect an unwarranted and wholly fraudulent payment of that sum of the moneys, funds and credits of said joint stock land bank by the said First National Bank of Kansas City, Missouri, to said payee, in behalf of and for the use, benefit, advantage and credit of said Missouri Hydro-Electric Power Company; and this when, as said Walter Cravens and said Alice B. Todd then and there well knew, neither said Missouri Hydro-Electric Power Company nor said Kansas City Finance Company had any moneys, funds or credits with said joint stock land bank, nor any right of any kind or nature whatsoever to have such sum, or any sum, of the moneys, funds and credits of said joint stock land bank so applied; whereby the said sum of $1,189.30 of the moneys, funds and credits of said joint stock land bank was wholly lost to said joint stock land bank, and the assets thereof depleted in that amount."

The evidence under the first 33 counts of the indictment shows that between July 2, 1925, and October 9, 1925, the defendants paid out of the land bank, by checks signed by themselves, the aggregate sum of $133,922.-61; that this amount was disbursed through the Kansas City Finance Company, a corporation controlled by defendants, for the payment of expenses incurred on behalf of the Missouri Hydro-Electric Power Company, a corporation controlled by defendant Cravens; and that it was charged on the books of the land bank to a "Special Bond Investment Account," thus indicating that it represented the amount of an investment in bonds, which of course under the law the bank would have the right to make. This account did not show the real transactions, and when embodied in monthly reports to the Farm Loan Board would have deceived that body. We set forth here the testimony of Mr. Bennetts, chief witness for the government, with respect to count 1 of the indictment:

"Q. Mr. Bennetts, I ask you during the course of your examination of the affairs of The Kansas City Joint Stock Land Bank you had occasion to inquire into the matter of a certain check, being Government's Exhibit Number 184 heretofore introduced in evidence, check in the sum of $1,189.30 dated July 6th, 1925. A. I did.

"Q. Being check bearing the names of Walter Cravens and Alice B. Todd. Upon whom was that check drawn? A. It was drawn on the First National Bank of Kansas City, against the account of The Kansas City Joint Stock Land Bank.

"Q. To whom was the check charged on the books of the First National Bank of Kansas City? A. The check was charged to the

account of The Kansas City Joint Stock Land Bank on the books of the First National Bank of Kansas City.

"Q. To whom was it made payable? A. To the order of the Kansas City Finance Company.

"Q. And to whom was it credited in the account of the Kansas City Finance Company in the First National Bank? A. The check in question was paid and charged to the account of The Kansas City Joint Stock Land Bank by the First National Bank of Kansas City on the 6th day of July, the proceeds thereof credited to the account of the Kansas City Finance Company in the same bank.

"Q. Have you there with you that memorandum that was offered in evidence as Government's Exhibit Number 309? A. I haven't it with me. You will find it in an envelope marked 'Letters.' It is right on top there, if I remember right.

"Q. Were these in any particular order? A. No. They have been, but I can't keep them that way.

"Q. I won't muss them up, then. I hand you herewith Government's Exhibit 309 being letter heretofore introduced in evidence, from Miss Todd to you, and ask if that is the item of $1,189.30—if that is one of those items recited in that exhibit as having been disbursed to the Missouri Hydro-Electric Power Company for logging expenses? A. Exhibit 309 shows disbursement of that identical item as logging expense.

"The Court: What kind of expense? A. Logging.

"Q. And now, witness, as to whether that amount was charged on the same day, July 6th, 1925, to the special bond investment account. A. The charge was made in the special bond investment account on the same date, July 6th, 1925."

The above testimony is typical of Mr. Bennetts' testimony with respect to all 33 counts now being considered. It showed that the entire $133,922.61 went for such things as logging, surveying, engineering, and construction expenses, and for the expense of obtaining options, on behalf of the Missouri Hydro-Electric Power Company. There is no doubt that the agricultural depression resulting in the deflation of land values had much to do with the situation. By 1925 the land bank had been forced to foreclose upon the farms represented by some $1,700,000 of the approximately $50,000,000 of loans it had outstanding. The depression almost destroyed the market for agricultural lands, which rendered it difficult, if not impossible, for the land bank to realize upon the lands upon which it was forced to foreclose.

Under these circumstances defendant Cravens contends that he conceived the idea of developing a great water power project in the heart of the Missouri Ozarks that would furnish power to St. Louis and Kansas City and also, indirectly, form a market for the "frozen assets" of the land bank in the form of foreclosed farms. This project seems now to be fully completed, and the construction of Bagnell Dam, forming as it does the lake of the Ozarks, has required the inundation of the farms in an area over one hundred miles in length.

Defendant Cravens acquired the franchise for this project by incorporating the Missouri Hydro-Electric Power Company. On March 10, 1925, he caused to be executed between the Kansas City Joint Stock Land Bank and the Missouri Hydro-Electric Power Company an agreement whereby the land bank was to trade its foreclosed farms scattered here and there over the states of Missouri and Kansas for farms within the territory to be inundated, which farms the Hydro-Electric Company would purchase from the land bank at an agreed value. This agreement called the "Trading Agreement" was signed on behalf of the land bank by Cravens and on behalf of the Hydro-Electric Company by its secretary, one Eyssell.

Eyssell, who signed the contract as secretary, owned one share in the Hydro-Electric Company, while Cravens, who signed for the land bank, owned 498 shares of the 500 shares of that company. It is apparent that Cravens was the controlling person in both the Hydro-Electric Company and the land bank, and in the transactions between said companies was acting in a dual capacity.

The government contends that Cravens with this contract as a seeming protection started out to engineer a $30,000,000 development, the success of which was at the time highly problematical, and intentionally and willfully used money of the land bank for the benefit of the Hydro-Electric Company. The amount of paid-in capital held by the Hydro-Electric Company does not appear in the record. It was of course not greater than the authorized capital of $30,000. But defendant Cravens, being primarily the promoter of the project it may be presumed intended from the beginning that it be financed to completion, as it actually has been, by being taken over by larger interests. This

much, however, we think clear from the evidence: The items in the $133,922.61 that went for logging, engineering, and construction expenses incurred on behalf of the Hydro-Electric Company represent not merely items that the land bank could be called upon to pay for the purpose of putting the lands in condition to be traded to the Hydro-Electric Company, in accordance with the terms of the contract, but represent in reality the initial financing of the whole power project. This fact is not changed by the existence of a liability on the part of the Hydro-Electric Company to reimburse the land bank for the expenses thus incurred, considering the contingent character of the Hydro-Electric Company's power to satisfy that liability. It had no financial life distinct from the land bank. In its early stages at least it had no funds. Where it received any money to carry on otherwise than from said land bank may well have puzzled the jury.

The statute claimed to be violated here is section 984, 12 USCA, supra. To constitute the offense therein described it is necessary not only that the misapplication of funds take place, but the same must be with intent to defraud the institution or to deceive the government officer or agent appointed to examine into the affairs of the bank. That there was a misapplication of funds could hardly be denied. Was that misapplication willful and with the intent to defraud and deceive? It can be argued with some plausibility and is, that there was no deliberate intention to injure the bank, in view of the trading contract of March 10, 1925. What the defendants were apparently doing was to finance the promotion of the power project, hoping thereby both to gain for themselves the profits of successful promotion, and by some possibility indirectly to benefit the bank in its difficulties as to frozen assets. But this is not a sufficient defense. The Federal Farm Loan Act, in creating the crime of misapplying the funds of a land bank, 12 USCA § 984, supra, uses the same language as R. S. § 5209, 12 USCA § 592, which deals with the misapplication of funds of a national bank. With reference to the latter statute it was said in Galbreath v. United States (C. C. A. 6) 257 F. 648, 656: "An intent to injure or defraud, as contemplated by the statute, is not inconsistent with a desire for the ultimate success and welfare of the bank. It may, within the meaning of the law, result from an unlawful act voluntarily done, the natural tendency of which may have been to injure the bank. A wrongful misapplication of funds, even if made in the hope or belief that the bank's welfare would ultimately be promoted, is none the less a violation of the statute, if the necessary effect is or may be to injure or defraud the bank. Such is the well-settled law. United States v. Harper (C. C.) 33 F. 471; United States v. Kenney (C. C.) 90 F. 257; United States v. Breese (D. C.) 131 F. 922, 923."

In Walsh v. United States (C. C. A. 7) 174 F. 615, 618, the court said in sustaining a conviction for the misapplication of funds of a national bank: "For a promoter of various enterprises to obtain the funds of a bank on the security of unmarketable bonds of his own enterprises at the risk of the interests of the bank is not proper and legitimate banking, and the entries on the books of the bank as loans and investments do not conceal the fraud thus perpetrated upon the bank."

The promoter in the above case was an officer in the bank thus used to finance the promotion of his own enterprises. The case is closely analogous to the instant case, where the defendants, as officers of the land bank, used the land bank's funds to promote an enterprise of defendant Cravens, with no real security whatsoever for their return. That they hoped also thereby to benefit the bank, or that the enterprise actually was successful, is not material. The funds of the bank could not be legitimately used in a gamble of this nature.

On the question of intent it is said in United States v. Kenney (C. C. D. Del.) 90 F. 257, 267: "An intent to injure or defraud a national bank within the meaning of section 5209 of the United States Revised Statutes does not necessarily involve malice or ill-will toward the bank. * * * But the law presumes that every sane person who has attained the age of discretion contemplates and intends the necessary or natural consequences of his own acts. It is sufficient that the unlawful intent is such that, if carried into execution, it will necessarily or naturally injure or defraud the bank."

In Agnew v. United States, 165 U. S. 36, 53, 17 S. Ct. 235, 242, 41 L. Ed. 624, the Supreme Court approved the following instruction: "It is a well-settled rule, which the law applies in both criminal and civil cases, that the intent is presumed and inferred from the result of the action. If, therefore, the funds, moneys, or credits of the First National Bank of Ocala are shown to have been either embezzled or willfully misapplied by the accused, and converted to his own use,

whereby, as a necessary, natural, or legitimate consequence, the association's capital was reduced, or placed beyond the control of the directors, or its ability to meet its engagements or obligations or to continue its business was lessened or destroyed, the intent to injure or defraud the bank may be presumed.".

And in Morse v. United States (C. C. A. 2) 174 F. 539, 554, 20 Ann. Cas. 938, certiorari denied Morse v. United States, 215 U. S. 605, 30 S. Ct. 406, 54 L. Ed. 346, it is said: "The motives which actuate men can be ascertained only by a scrutiny of their acts. * * * A bank officer who willfully misapplies the funds of the bank, or who makes or causes to be made a false entry in its books, knowing it to be false, cannot be heard to say that he did the act innocently. The misapplication of its funds necessarily tends to injure or defraud the bank, and he who commits the act cannot escape the natural inference which flows therefrom. So, too, as to a false entry, such an entry is calculated to deceive, and he who made it, or caused it to be made knowingly, cannot avoid the inevitable presumption."

█ It is sufficient to show intent under the governing statute if the acts of defendants here, for which there was clearly no authority, were at all calculated, as of the time they occurred, to injure or defraud the bank.

The court as to this issue gave to the jury the instructions asked by the defendants as follows: "The court charges the jury that the first thirty-three (33) counts of the indictment in this case are based upon alleged criminal misapplication of the funds of the Kansas City Joint Stock Land Bank, and you are instructed that in order for the defendants to be guilty of such misapplication of said funds, there must have been a conversion of said funds of said bank to the use of the defendants, or either of them, or some other person or corporation than said Kansas City Joint Stock Land Bank, with intent on the part of the defendants to injure and defraud said Kansas City Joint Stock Land Bank, and, if you find and believe from the evidence either that there was not a conversion of the funds of said bank, as aforesaid, or that there was not an intent on the part of the defendants to injure and defraud said Kansas City Joint Stock Land Bank, then defendants are not guilty of the charges alleged in said first thirty-three (33) counts of the indictment, and you must acquit them of the charges therein contained and declare them not guilty."

The court also put squarely to the jury the question of whether defendants had acted in good faith in the transactions with the Hydro-Electric Company with regard to exchange of farms by giving another requested instruction of defendants as follows:

" 'The court instructs the jury that, if you find and believe from the evidence in this case with respect to the charges in the first thirty-three (33) counts in the indictment in this case that in the year 1925, owing to deflation in farm values, The Kansas City Joint Stock Land Bank had come into possession through foreclosure and otherwise of large numbers of farms and that at said time there was not a ready market therefor and that for the purpose of converting some of said farms into marketable lands the defendants in good faith entered into that certain trading agreement in evidence with the Missouri Hydro-Electric Power Company, bearing date of March 10, 1925, by the terms of which said Missouri Hydro-Electric Power Company agreed to purchase for cash, on an agreed appraised value, so much of the land in said hydro project area as said Kansas City Joint Stock Land Bank might acquire in trading therefor the said farms so acquired by it by foreclosure or otherwise and also would reimburse said Kansas City Joint Stock Land Bank for expenses incurred in obtaining options on said lands in said hydro area and in making a survey thereof and for other expenses which might be necessary to put said lands in said hydro area in condition for said Missouri Hydro-Electric Company to take them over and that under and in pursuance of said contract the said Kansas City Joint Stock Land Bank expended the moneys mentioned in said first thirty-three (33) counts of the indictment,' then in that event, if you find that that transaction—that agreement—was made in good faith—'then such use of said funds was not a criminal misapplication of the moneys of said Kansas City Joint Stock Land Bank and you must acquit the defendants on each of said thirty-three (33) counts of the indictment.' "

In returning a verdict of guilty in the face of the above instructions, the jury evidently believed, and it was in their province under the evidence to so believe, that it had not been in entire good faith that the defendant Cravens had entered into the contract of March 10, 1925; that he had not done this solely as a means of relieving the land bank of its frozen assets; that he had been actuated more by the motive of personal gain in the promotion of the power project

and a careless indifference to the bank's welfare in using the funds for the promotion of an independent enterprise. They were further justified we think in finding an absence of entire good faith in the matter by the charging of the sums so paid out to a fictitious "Special Bond Investment Account," which indicated an investment of surplus funds in bonds. Why should defendants have so sought to conceal the true nature of legitimate expenses incurred solely for the protection of the bank? It would seem the charging of the sums paid out to the "Special Bond Investment Account" might have been made the basis of additional false entry counts not contained in the indictment.

Defendants contend that four days after the last expenditure referred to in counts 1 to 33 the "Special Bond Investment Account" was liquidated by the payment of $495,715.30. It is true that such credit was made which balanced the account. There was also paid at that time interest and bond premium making total amount of credit $497,492.64. The government asserts that the $497,492.64 claimed to have been so paid into the bank was not the property of defendants or their associates. This question was gone into thoroughly by the witness Manson. His testimony is too long and involved to be herein set forth. It deals with the method by which this credit of $497,492.64 was brought about, which involved increase in the capital stock of the bank, issued to Cravens, loans made by him thereon from various banks in Chicago, New York, Kansas City, and St. Louis in the amount of $850,000, the securing of government bonds and cash amounting to $846,927.79, turning the bonds over to the Kansas City Finance Company, the selling of same, the giving of Cravens' personal check for $112,827.96 on his personal account in the First National Bank of Kansas City, where some of the cash proceeds of the $850,-000 of notes had been deposited, and finally the giving by the finance company of its check for the $497,492.64 to the land bank. If Manson was believed by the jury, they were warranted in concluding that the $497,-492.64 credited came out of the funds really belonging to the land bank, and that it completely lost the $133,922.61 paid out, as covered by counts 1 to 33, to the Hydro-Electric Company. The force of Mr. Manson's testimony was undoubtedly weakened by the cross-examination, showing his letter to Mr. Brewster, which, as of the time written, gave a clean bill to the land bank management. Its credibility and weight were for the jury—not for us. In any event liquidation of the "Special Bond Investment Account," while bearing on the question of lack of intent to defraud, would not entirely clear defendants if the original taking was wrongful and unlawful. Officers of these land banks cannot enter into schemes requiring the wrongful taking of funds from the banks, and then, if successful and the money is returned, claim that the return of necessity shows there was no intent to misapply the funds of the banks. If the appropriation of money was wrongful, the crime was then committed, and subsequent repentance would be no defense.

We are not to be understood as holding that the officers of a land bank, having on their hands a large amount of foreclosed lands, may not take steps for the purpose of realizing thereon that they would not otherwise be authorized to take. The question of good faith plays a large part in any such transaction. The jury were warranted in finding that the $133,922.61 paid out by the defendants from the land bank between July 2, 1925, and October 9, 1925, did not so much represent expense incurred in the trading of farms, which might have been legitimate, as it represented the actual financing, by the payment of logging, engineering, and construction expenses incurred by the Hydro-Electric Company on lands not as yet owned, or ever owned so far as appears from the record, by the land bank, of an independent enterprise, on the problematical success of which depended not only the hoped-for benefit to the land bank but also its reimbursement for having financed the new enterprise. Had this enterprise not succeeded, the land bank would have been injured far more than the hope of incidentally benefiting it through the promotion of the enterprise at its expense would have been justified. And the jury were warranted in finding that the success of the enterprise had been sufficiently problematical at the time to render the payment of funds of the land bank in its promotion a criminal misapplication of such funds. Indeed, the mere possibility of failure and consequent loss to the bank of the funds so paid out was enough to warrant the jury in finding an undoubted misapplication to have been criminal, in accordance with the instructions of the court. It is of course not the province of joint-stock land banks to assist in development of hydro-electric projects.

We pass to counts 74–88 of the indictment, of which 74–80 are misapplication counts, and 81–88 are false entry counts. The evidence to sustain the finding of the jury as to these counts is clearer than as to the others. The evidence under counts 74–80

shows that between September 26, 1924, and June 30, 1925, defendants paid out from the land bank, by checks, signed by themselves, the sum of $16,604.22, which went to the use and benefit of themselves and the Kansas City Finance Company. The amounts paid out in connection with counts 74 and 75 were charged on the books of the bank to the "straw" loan standing in the name of one Ossie Carvington, thus indicating an addition to the amount of the bank's investment in that loan; while the amounts paid out in connection with counts 76–80 were charged as disbursements to the borrower on the loan of Albert and Cora Knollin. The facts as to these counts are fully set forth in the testimony of Mr. Bennetts, which it is unnecessary to reproduce here. His testimony would be sufficient to take these counts to the jury.

Counts 81–88 are false entry counts based on the charging to the Knollin loan as disbursements to the borrower at various intervals of a total of $20,804.84. These entries appear in the individual mortgage records of the land bank. No such disbursements were in fact made to Knollin, whose mortgage had been released of record owing to a flaw in his title, and for this reason the loan to him was never completed. Counts 82, 83, 85, 87, and 88 are based on the charging to the Knollin loan of the misapplications charged in counts 76, 77, 78, 79, and 80; while counts 81, 84, and 86 are based on the charging of other amounts not in fact represented by disbursements to Knollin. Mr. Bennetts' testimony under counts 81, 84, and 86, is here set forth, as follows:

"Q. Count 81 concerns a charge of $6,-106.35 on the individual mortgage record on September 26, 1924, against the Knollin loan. Turn to that, please, Mr. Bennetts. Individual mortgage record loan No. 4806 the Knollin loan, please. Has that page been specially marked? A. Government's Exhibit 348.

"Q. Yes. Now do you find on that page under date of September 26, 1924, an entry in the sum of $6,106.35, as though that sum had been paid out to the borrowers? A. In the disbursement column headed 'Loans Paid Out' under date of September 26, 1924, this record shows, a check No. 15012 in the amount of $6,106.35 is shown as a disbursement on the Knollin loan.

"Q. Now from your own examination of the books and records, Mr. Bennetts, tell what that disbursement—to whom that money was actually paid?

"Mr. Conrad: Well, I object to that as immaterial in this count on the ground that it is a count involving false entry loan.

"The Court: Objection overruled.

"Mr. Conrad: Except. (To which action and ruling of the court defendants, jointly and severally, then and there excepted and still except.)

"Q. It shows it is false— A. What was the question, please? (Question read.)

"Q. From your investigation can you tell —I will withdraw that and ask this—from your investigation can you tell us to whom that amount of $6,106.35 was actually paid, charged to that Knollin loan? A. The proceeds of Land Bank check No. 15,012 for $6,016.35 were deposited to the credit of the Land Bank's account in the First National Bank of Kansas City, on the 27th day of September, 1924, being included in a deposit of $19,379.46. This sum was thereupon applied in addition to other sums to show that amortization payments, accumulated expenses, taxes, insurance and so forth, and various items which had been charged to accounts receivable, had been paid by the makers of the various straw loans, which were credited to cash, receipts journal of the Land Bank pages 278, 279; I don't know the Government's Exhibit—exhibited items which received credit at that time, the amount of $6,-016.35 having been debited to deferred loan 4806, or the Knollin loan, and credited to the accounts receivable advance, accounts receivable, insurance, accounts receivable suspense, accounts receivable miscellaneous, a small item of penalty and amortization installments advanced. The credits. The total amount of credits on that day being $18,-903.63, the total amount of debits, the same amount, of which this $6,016.35 is a part.

* * *

"Q. All right. Proceed to count 84. This is also a count based on an alleged false entry. Now, Mr. Bennetts, as to count 84 I ask you whether on the individual mortgage record there of the Knollin loan you find an entry of $2,565.50 entered as though that charge were paid out to the borrowers, as though that amount were paid out to the borrowers on October 1, 1924? A. In the 'Loans Paid Out' column of the individual mortgage record No. 4806 under date of October 1, 1924, Land Bank check No. 15,021 for $2,565.50 is shown as a disbursement on this loan.

"Q. Yes. Now what actually became of that money? A. It was used to pay amortization payments on the four loans that were

previously testified to in connection with the false entries on the receipts journal.

"Q. Yes. To pay amortization payments in connection with those loans that had been set out in counts 61, 62, 63 and 64 of the indictment. * * *

"Q. Turn to Count 86. Now I ask you whether there in the same—on the same page, the disbursement column, of the individual mortgage record, the Knollin loan, you find an entry of the sum of $2,762.99 purporting to have been disbursed on December 31, 1924? A. Land Bank check No. 28,326 shows that disbursement on that date.

"Q. Now what actually became of the proceeds of that purported disbursement? A. What counts does it refer to?

"Q. Oh, it refers to Count 86, Mr. Bennetts. A. No, I mean the placing of the disbursement?

"Q. There is no corresponding count of misapplications. That is the Murphy, McCubbin, Lothman, Lindholm transaction, so you can find it. A. The proceeds of this check, 28,326, and of another check No. 28,330 in the sum of $10.00, the other two being $2,762.99, were taken into the accounts of the Land Bank on the 31st day of December, 1924, and were applied to the payment of items which had been charged to the accounts receivable as advance to borrowers on straw loans 2849, 2892, 2893 and 2896.

"Q. Yes. Now were those the straw loans respectively to Murphy, McCubbin, Lothman and Lindholm? A. 2849 is a straw loan in the name of R. F. Murphy for $23,000.00; 2892 is a straw loan in the name of A. D. McCubbin for $22,000.00; 2893 is a straw loan in the name of Arthur J. Lothman for $15,500.00; 2896 a straw loan in the name of Ralph Lindholm for $18,000.00."

It seems to us that a clearer prima facie case of misapplication and false entries, as charged in counts 74–88, could hardly be made out. As to counts 74–80, the sums charged to have been misapplied are clearly shown to have gone for the use and benefit of defendants Cravens and Todd and the Kansas City Finance Company, owned and controlled by defendants. As to counts 74 and 75 defendants contend that defendant Cravens had a credit of $15,000 owing to him from the land bank as the result of a "straw" loan of that amount having been mistakenly included in a list of similar loans that he was taking off the hands of the land bank, and for which he had given his check; and that the payments made under counts 74 and 75 represented the rectification in part of this mistake. As to counts 76–80 defendants contend that the moneys there paid out were owing to defendant Cravens as the result of his having paid the operating expenses of the land bank during its early stages, when to have paid them itself would have impaired its capital stock. But aside from the fact that there was nothing on the books of the land bank to indicate such liabilities, the merits of these defenses to counts 74 and 75 and counts 76–80 are for the jury and not an appellate court to decide; and the jury has decided the issue against defendants.

Counsel for defendants say in their argument as to counts 81–88 inclusive: "These counts, and the charges therein, present the most embarrassing position or situation, on the face of the record, of all the charges made in the indictment, for the reason that loan 4806, executed by one Albert J. Knollin to the Land Bank, was not one of the accumulation mortgage loans to which it was the practice and custom of the Bank to charge items of expenses and advances, but was, in fact, a loan pending on an application of Mr. Knollin, and was held up pending the curing of the title to the property." We are unable to see any honest explanation of the Knollin transaction, as there was no reason whatsoever for making the charges against the Knollin loan. The defense offered by defendants is that through error and mistake the Knollin loan was included in a list of accumulation or "straw" mortgage loans "available for such charges." The merits of this defense likewise presented a question for the jury and not an appellate court. But we may say in connection therewith that, even had there been no mistake, that is, had the Knollin loan been a real accumulation or "straw" loan, it would still not have been "available for such charges" as were made against it in connection with counts 81–88. By "straw" loan is meant a fictitious loan standing in the name of an irresponsible person on land already acquired through foreclosure by the bank itself. These loans seem to have been freely used by the land bank. To the lay mind the practice of a bank in putting title to lands in irresponsible third persons and taking mortgages back to augment its assets and holding an unrecorded deed to the property is hard to reconcile with square dealing, and yet such loans may possibly serve a legitimate purpose in helping the bank to dispose of its acquired real estate, and in event of use should represent the total amount of the bank's interest in the particular property on which the loan is charged, that is, the amount of the loan to the orig-

inal borrower still unpaid plus expenses of foreclosure, taxes, insurance, upkeep, etc. Defendant Todd showed that she understood the legitimate purpose of "straw" loans when she testified on direct examination: "We placed the properties in the names of nominees for the bank. These nominees gave to the bank a new mortgage on the property—called straw mortgages—which mortgage carried on to the books the bank's investment in that particular tract of land." But for the bank to charge to a particular "straw" loan amounts paid out by the bank as taxes and insurance on totally different properties, or amortization payments advanced on behalf of other defaulting borrowers in order to preserve the efficacy of their loans as security for bonds, or to charge to "straw" loans in general amounts paid out for the personal use and benefit of defendants or the Kansas City Finance Company, is as improper and deceiving as to charge such items and disbursements to the borrower on an ordinary loan. The testimony of Bennetts not only made out a prima facie case of false entry with respect to the charges made against the Knollin loan, but of itself warranted the jury in rejecting defendants' proffered excuse.

With respect to the crime of false entry, it is well said in United States v. Graves (D. C. N. D. Iowa) 53 F. 634, 644, 645, that the test is whether the entry in the books, "when therein made by defendant, was untrue and false, and was known to him to be untrue and false at the time he made it, and, having that knowledge, he entered it therein as being correct and true." Farther on in the opinion, at page 657 of 53 F., it is said: "If a director of a national bank, in a report to the comptroller of the condition of his bank, makes an entry which is false, which does not contain or state the truth with regard to the condition of the bank upon the date named in this report, and such entry relates to a material matter, and such director, at the time he made such false entry, knew it was false and calculated to deceive, and that it did not give a true and correct statement of said bank's condition at the time with respect to such entry, in such case the law will not permit him to say that he made such false entry with innocent intent, and not expecting to deceive any one thereby." In Morse v. United States (C. C. A. 2) 174 F. 539, 547, 548, 20 Ann. Cas. 938, it is pointed out that "no examination of the books and reports would have led to a discovery of the truth, and the jury may well have found that the entries were false and made with the intent denounced by the statute."

It is the well-established law that an entry on the books of a bank that correctly records a transaction exactly as it occurred is not a false entry even if the transaction is fraudulent. United States v. Young (D. C.) 128 F. 111, and Coffin v. United States, 156 U. S. 432, 15 S. Ct. 394, 39 L. Ed. 481; and Id., 162 U. S. 682, 16 S. Ct. 943, 40 L. Ed. 1109. That does not apply to the situation as to these counts. These entries make no pretense of recording the transactions as they occurred.

The subsequent wiping out of the charges made to the Knollin loan by a fictitious deposit in the First National Bank of Kansas City, which was in turn balanced by the receipt of $50,000 in Liberty bonds and the charging of more than $85,000 to straw loans on a single tract of land testified not to be worth more than $30,000, only added to the evidence before the jury on which to base its finding with respect to the false entry counts, 81–88. And the charging to the Carvington and Knollin loans of payments made for the personal use and benefit of defendants and the Kansas City Finance Company, as shown under the misapplication counts, 74–80, added to the evidence before the jury on which to base its finding of intent to injure and defraud the bank with respect to those counts.

In view of our conclusion as to counts 1–33 and 74–88, they being inclusive of counts 1–15 and 79–88, which are sufficient, with respect to both defendants, to sustain the total prison sentence and total fine imposed, it is unnecessary for us to consider the possibility of alleged error with respect to any of counts 34–73. As said in Caldwell v. United States (C. C. A. 10) 36 F.(2d) 738, 742: "It is unnecessary to consider in detail case No. 83. The offenses there charged were a part of the same general plan to disclose a fictitious asset of $120,000, the sentence was concurrent with the sentence in case No. 84, and the defendant cannot be prejudiced by error, if any, on that trial." And as said in Morse v. United States (C. C. A.) 174 F. 539, 543, 20 Ann. Cas. 938: "Indeed, if the conviction can be upheld upon two of these counts, it is sufficient to sustain the judgment."

Notwithstanding this, we have given study to all the counts and refer to a few not hereinbefore discussed as typical of how the business of the bank seems to have been carried on by defendants.

Count 54, a misapplication count, charges that Cravens sold to the land bank and receiv-

ed check therefor $50,000 of government securities belonging to the Metropolitan Bank of Kansas City, which had been deposited with the land bank to protect an account of the land bank opened with the Metropolitan Bank. They were not a part of the assets of the land bank. The records as testified to by Mr. Bennetts indicate that the land bank purchased from Cravens the $50,000 of U. S. bonds held as security. Later Miss Todd purchased $50,000 of government bonds by a check drawn on the Farmers' Fund, Inc., payable to the First National Bank of Kansas City, and turned the same over to the Metropolitan Bank, taking its receipt therefor. Where the Farmers' Fund, Inc., secured the money does not appear. Miss Todd testifies the Farmers' Fund, Inc., had no money to speak of; that it was a concern with only $2,000 capital. It was operating as a nominee for the bank. A statement of Miss Todd, signed by her is in evidence as follows: "The Liberty Bonds totalling $50,-000.00 have been this day handed to the Metropolitan Bank of Kansas City were handed to me this day by Walter Cravens, President of The Kansas City Joint Stock Land Bank, dated December 22, 1925," which hardly tallies with her statement as to purchasing the same. The land bank did not use at any time funds to the amount of $50,000 belonging to the Metropolitan Bank. Cravens did not disclose to the land bank the source of these bonds. Cravens and Miss Todd had access to the security boxes containing the same. A government examiner in December, 1925, in checking securities found a shortage of $50,000 in government securities. It is quite apparent that from the date (June 12, 1925) Cravens sold the land bank government bonds in the amount of $50,000, which were not his, to December 22, 1925, when Miss Todd delivered $50,000 of government bonds to the Metropolitan Bank, they were in the land bank only as security, and the bank had no title thereto. The $50,000 paid Cravens by the land bank secured nothing in return to the bank. The restitution of the bonds to the Metropolitan Bank on December 22, 1925, was not a defense to the misapplication theretofore brought about. The trial court put squarely to the jury the question of whether Cravens sold to the bank bonds belonging to the Metropolitan Bank. There was certainly ample evidence to take this count to the jury.

We refer to count 72 and the defense thereto as it indicates the position taken by Cravens as to his right to take moneys from the bank to pay him what he claimed the bank owed him. It charges defendants with misapplication of $53,500 of land bank funds under these circumstances; some $53,500 was due the land bank from the Guy Huston Company of New York. Cravens drew a personal draft on this company for the $53,500 which was paid and the funds deposited to his credit in the Metropolitan Bank of Kansas City. The land bank never received it. The defense to this is that the bank owed Cravens a large sum for money advanced by Cravens Mortgage Company and Cravens in the first four years of the bank's existence to cover operating expenses, etc., on a contingent basis, and moneys advanced to the bank on account of premiums due on sales of stock. Cravens in his testimony claims the land bank was indebted to him and associated companies for which he was agent in addition to the $53,500 which he kept in the Huston transaction, some $53,000. The witness Miller who prepared the so-called Manson account testified that the same reflected a balance due Cravens of some $188,000, some of the information being given on unverified items by Cravens and Todd. The court submitted to the jury the issue which is vital as to this and many other counts of whether the land bank was indebted to Cravens as claimed by him. The court said:

"The contention is, as you have heard it put to you, that these alleged misapplications were not misapplications at all, but that they were repayments to Mr. Cravens of sums that were due him by the bank, having previously been advanced by him to the bank, or by some companies with which he was connected, to the bank. You will have to pass upon the issue as to whether the bank, The Kansas City Joint Stock Land Bank, did owe Mr. Cravens $250,000 more or less—I use that sum because it comes to my mind as having been mentioned—the exact amount is not important—that is a question you gentlemen will consider when you are passing on this case, I have no doubt. Did the Joint Stock Land Bank owe Mr. Cravens a sum of money in excess at least of the amount referred to in these counts, dealing with the subject of misapplication? Outside of the thirty-three counts to which I have already made reference."

The jury evidently did not believe that the bank owed Mr. Cravens a large sum of money. It probably considered it significant that such alleged indebtedness did not appear on any of the records of the bank. Accountant Bennetts testified that his examination of the books and records of the bank disclosed no liability of the bank to Cravens. There is

apparently a conflict between Bennetts' evidence and the Manson account. It is not for us to say whether or not the bank did owe Mr. Cravens. The evidence presented an issue for the jury and was sufficient to sustain the verdict on this count.

Counts 55, 56, and 57 are misapplication counts, 55 referring to a payment of $1,000 to Compton & Delaney out of land bank funds, the bank having no indebtedness to them. Cravens admits in his testimony the payment was for services to the Hydro-Electric Company. Counts 56 and 57 cover items of $1,000 and $1,276.59 respectively taken from the bank by direction of defendants for the use and benefit of Cravens and the Hydro-Electric Company, and having no relationship to any bank liability.

Counts 58, 59, and 60 are companion counts to 55, 56, and 57, based on false entries covering the same transactions. The evidence was sufficient as to all these counts to warrant submitting them to the jury.

We shall not discuss the evidence as to the remaining counts, as it would prolong this opinion to an indefensible length.

While Cravens was the controlling personage in the management of the land bank, the evidence is convincing that Miss Todd occupied a prominent place in its affairs and was active in its management. She and Cravens gave practically all instructions in carrying on its business. She was an important officer in the bank. From a salary of $75 per month in 1921, her salary fixed by Cravens and herself advanced to $8,700 per year in 1926. In the year 1922 she deposited in her personal bank account $165,123.05, which she explained by stating that the account was used by Mr. Cravens and the Cravens Mortgage Company, and that some of the account was trust funds. In 1923 she had a deposit of between fourteen and fifteen thousand dollars in her personal account. She testified that some of the items in her personal account were paid by the bank to Mr. Cravens and he permitted her to use them. In the year 1923 she was receiving $3,600 per year salary and drew from the bank $5,300 in addition thereto. In the year 1924 she received from the bank approximately $7,000. When she underwent an operation, the bank advanced the money to pay her hospital bills, although she had a personal account. In the evidence of misapplication charged under count 77 it appears that $400 of the money used went in part payment of a personal note of hers held by a bank at Salina, Kan. She exhibited a remarkable carelessness in looking after

the funds of the bank. Her close connection with the operation of the bank is manifested in her note to Mr. Cravens of November 7, 1924, in which she says:

"Mr. Cravens: There are certain little matters that should be closely watched in connection with the preparation of the report to the government. I personally went over the figures this month with Mr. Miller and I am sure the report is all right. What I refer to particularly are the items which we are holding in a more or less suspended account. For instance, your personal checks in payment of the Wichita stock matters are being held by Mr. Siler, the money, of course, having been shown on our books as deposited in the First National Bank at Kansas City account and it is not as a matter of fact, in that account."

Just what matters should be closely watched or why in reports to the government is not entirely clear. Her own evidence shows her far from guiltless.

Assignments of error 5, 6, 9, 10, 11, 12, 13, 14, 18, 19, 21, 22, 24, 27, 29, 31, and 35 relate to questions of evidence.

▆▆▆ Assignment 5 alleges error in overruling objection to the introduction of government Exhibits 4, 5, and 6, which were reports of the land bank to the Federal Farm Board, for the reason that none of the reports were the basis of any charge in the indictment. Miss Todd's signature was upon two of them. The false entries in the bank's books would necessarily be carried into the reports to the Farm Loan Board, thus deceiving agents and examiners of said board, and the reports would of necessity reflect such false entries. Intent to deceive the examiners enters into the crime charged. While such evidence was probably superfluous, it was not error to admit it.

Assignment No. 6 relates to alleged error of the court in overruling objection to government Exhibit 102, which is a deposit slip made by Cravens in Metropolitan Bank of October 6, 1925, in the sum of $53,500. This is involved in count 72, heretofore discussed. It is not denied that Cravens received this $53,500 on a draft drawn by him on Huston & Company at New York, which Cravens claims belonged to him because the land bank owed him a sum in excess thereof. The evidence of the deposit slip adds nothing to, nor detracts anything from, the story. There is no need we think of specifically discussing the remaining assignments as to error in the introduction of evidence or motions to strike the same. There is little, if any, more merit

in these than in the two we have referred to. We are not satisfied there was any prejudicial error in the court's rulings thereon.

The 45th assignment of error relates to this statement of counsel for the government, Mr. Patterson, in his argument to the jury: "How did they balance it? They balanced it with a check for $497,000 I believe the sum was—and where did the money come from? Where did they get it? They got it by issuing duplicate certificates of stock in the sum, I believe, of $1,000,000, wasn't it." He was evidently referring to the balancing of the "Special Bond Investment Account." The statement may not have been exactly accurate, but there was some basis for this argument. There was much controversy as to the claim of balancing this account, and the source of the check for $497,492.64 paid in by Cravens and associates to the land bank to liquidate the same. We have heretofore discussed this in relation to the first 33 counts. We think under the record there was nothing particularly objectionable in this statement of Mr. Patterson.

Assignment 46 relates to this statement of Mr. Dodds, special counsel for the government, in his argument to the jury: "The Cravens Mortgage Company books, you gentlemen know from the testimony, were impounded in a court in Kansas in connection with a case down there, and I sent down there and brought them up yesterday and attempted to bring them in here, and they wouldn't let them in because they said we couldn't show that they were accurate. If a man were to be allowed to create half a dozen corporations and then object to the introduction of any of their books—" The statement as to the creation of "half a dozen corporations" as applied to Cravens was only beside the mark in a slight exaggeration as to the number. The evidence did not warrant the statement as to the impounding of the books in Kansas and the argument was subject to objection. However there could be no such prejudice arising therefrom as to warrant reversal of the case.

We have in view of our study of this voluminous record some sympathy with the argument advanced by defendants' counsel that the jury was necessarily confused by the multiplicity of counts. The great amount of evidence, much of it dealing with intricate bank affairs and explanatory of bank books did make difficult an intelligent understanding of every count. Confusion of the jury however is no ground for reversal.

As said in Morse v. United States (C. C. A.) supra, at page 541 of 174 F.: "It is argued that a jury, with nothing but the memory of its members upon which to depend, cannot keep such a tremendous record of complicated facts in mind, and that its conclusion must inevitably be based upon vague general impression and conjecture. These considerations would be persuasive were they germane to the issue now before us. They should, however, be addressed to the legislative and not to the judicial branch of the government."

We think defendants should not have been convicted on counts 50, 53, and 73, and the judgment on each of these counts is set aside. As to all other counts we are satisfied there was no miscarriage of justice. The judgments thereon as to both defendants are affirmed.